IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

|  |  |  |
|---|---|---|
| LNV Corporation, a Nevada corporation, | ) ) ) ) | Court Action: 0:13-cv-01926-JNE-LIB |
| Plaintiff, | ) ) ) |  |
| vs. | ) ) ) |  |
| Outsource Services Management, LLC, a Nevada limited liability company d/b/a Presidium Asset Solutions; and BF-Negev, LLC, a Minnesota limited liability company, | ) ) ) ) ) |  |
| Defendants. | ) ) ) ) |  |

**LNV CORPORATION'S MEMORANDUM IN OPPOSITION
TO OSM'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**INTRODUCTION**......................................................................................................... 1

**GENERAL BACKGROUND FACTS** ...................................................................... 4

**DISPUTED ISSUES OF MATERIAL FACT** ......................................................... 8

      **A.**      **The Fraudulent Inducement of Participants—Including Columbian Bank.** .................................................................................................... 8

**ARGUMENT** ............................................................................................................ 21

**I.**      **The standard for summary judgment supports denial of Defendants' motion.** ....... 21

**II.**     **Summary judgment should be denied or deferred under Rule 56(d) as discovery is not complete and LNV has demonstrated additional discovery is necessary.** ............................................................................................... 21

**III.**    **The fraudulent inducement of the Grande Palisades Participation Agreement renders it voidable and, therefore, it is inappropriate to limit LNV to its contract-based claims.** ................................................................................ 25

      A.     Fraudulent Inducement Renders a Contract Voidable. ......................... 25

      B.     Legal Standard for Fraudulent Inducement. ........................................ 27

      C.     The Facts of this Case Demonstrate a *Prima Facie* Case of Fraudulent Inducement. ........................................................................................... 27

           1.     A material misrepresentation was made. .................................... 27

                a)    *Alternatively OSM and its predecessors concealed a material fact requiring disclosure.* ................................................ 28

           2.     OSM and its predecessor(s) knew the statement was false...................... 30

           3.     OSM's predecessors made the fraudulent statements, or concealed the material facts, with the intention of inducing reliance, and reasonable reliance was thereby induced. ................................... 31

           4.     The fraudulent inducement and concealment of OSM and its predecessors caused damages. ................................................. 33

      D.     Violation of the Law Renders Contracts Unenforceable. ..................... 34

**IV.**    **Regardless of whether LNV asserts a fraudulent inducement defense, case law holds, and the Federal Rules of Civil Procedure provide, that LNV may plead in the alternative.** ................................................................................ 35

i

**CONCLUSION** ................................................................................................................ 38

## INTRODUCTION

In ruling on the pending summary judgment motion brought by Outsource Services Management, LLC ("OSM") and BF-Negev, LLC ("BF-Negev") the Court is presented with three straightforward issues:

1. Rule 56(d) allows courts to deny summary judgment motions when facts are not yet available to the non-moving party. Here, the Court's Scheduling Order provides the "period during which the parties may conduct fact discovery shall terminate on **October 23, 2014**." [Dkt. 55, emphasis in original.] Should summary judgment be granted when facts necessary to oppose summary judgment are currently unavailable to LNV Corporation and additional discovery will likely provide access to those facts?

2. New York law provides that contracts induced by fraud are voidable. OSM induced LNV Corporation's predecessor in interest to enter into the Grande Palisades Participation Agreement by concealing that the borrower was not putting $30 million of its own equity into the Grande Palisades construction project as required by the loan documents. Should LNV's non-contract claims be dismissed if the contract at issue was induced by fraud?

3. Use of the election of remedies doctrine to prevent pleading alternative theories has been eviscerated by the permissive rules of pleading under Rule 8, and Rule 8(d)(2) expressly provides that parties may plead their claims for relief in the alternative. LNV pleaded claims in the alternative to its breach of contract and declaratory judgment claims. Should LNV's claims other than breach of contract and declaratory judgment be dismissed?

OSM's motion for partial summary judgment is premature. As this Court noted in its March 4, 2014 Order, "this dispute is not ripe for adjudication." (Dkt. 71 at 6.) There remain numerous disputed material fact issues, including those identified in the Court's March 4th Order. (*Id.* at 6-7.) Indeed, the quantity of disputed fact issues since March 4th actually increased because the issue of fraudulent inducement was not raised until LNV filed its Affirmative Defenses to OSM's Counterclaims on April 1, 2014. (Dkt. 81.) Accordingly, OSM's piecemeal approach, seeking partial summary judgment, is

1

premature as additional and adequate discovery is needed.  The Affidavit of Charles Schoenwetter filed with this memorandum outlines the good faith discovery required to obtain specific facts necessary to rebut OSM's suggestion there is an absence of genuine issues of fact precluding the entry of summary judgment.

Facts supporting LNV's defense of fraudulent inducement are almost exclusively in the control of OSM[1]—as the perpetrator of the fraud—and still need to be developed through discovery, including depositions and written discovery.  As explained by the Eighth Circuit, ***Rule 56(d) provides a "safeguard against an improvident or premature grant of summary judgment . . . and [it] should be applied with a spirit of liberality.***" *U.S. ex rel. Bernard v. Casio Magic Corp.*, 293 F.3d 419, 426 (8th Cir. 2002).

OSM's motion for partial summary judgment is premised on its argument that LNV should be relegated to its breach of contract causes of action and/or its causes of action seeking a declaration of rights under the participation agreements at issue.  OSM's arguments necessarily fail, and should not be accepted by this Court, if the contract(s) at issue are subject to being voided based on OSM's fraudulent inducement of the contracting party.  Accordingly, a threshold issue is whether LNV possesses a sufficient basis for pursuing its affirmative defense of fraudulent inducement against OSM.

The Affidavit of Cecelia Borenko, attached to LNV's Answer and Affirmative Defenses, provides detailed sworn testimony from a former OSM employee with specific

---

[1] The term "OSM" is occasionally used in this memorandum to refer to Outsource Service Management, LLC as well as its predecessors in interest to the Grande Palisades Loan, including Marshall Financial Group, LLC and BankFirst.

facts demonstrating OSM fraudulently induced participants to enter into participation agreements concerning the Grande Palisades Loan. (Dkt. 81-1.) Ms. Borenko's Affidavit is also noteworthy as it was submitted in another case in which OSM (but not LNV) is a party ("OSM's Florida Foreclosure Action") and was further corroborated by sworn affidavits from Stephen McKenzie and Stephen Mann, as well as verified interrogatory responses of Malbec Investment, LLC. Accordingly, a number of individuals independently concluded facts exist demonstrating OSM committed fraud in originating the Grande Palisades Loan. The specific facts contained in those documents also demonstrate OSM and its predecessors fraudulently induced the Grande Palisades Participation Agreement.

Additionally, LNV's causes of action for civil theft/conversion, unjust enrichment/quantum meruit, and constructive trust should not be dismissed because the Rules of Civil Procedure allow parties to state as many separate claims as they possesses regardless of consistency, and those claims may be in the alternative to each other. Fed. R. Civ. P. 8(d). Although an election of remedies issue may exist at the time of trial, no basis exists for dismissing alternative or inconsistent claims at the summary judgment stage as the election of remedies doctrine is a harsh doctrine, narrowly construed, and no longer applied to prevent alternative pleading. This is consistent with Rule 8's policy of construing pleadings "so as to do justice." Fed. R. Civ. P. 8(e).

## GENERAL BACKGROUND FACTS

1.      In 2007, Marshall Financial Group, LLC ("Marshall") agreed to loan $140 million (the "Grande Palisades Loan") to Lake Austin Properties I, Ltd. ("Lake Austin" or, the "Borrower") for the purposes of building an 890-unit condominium collateralized with, and secured by, a mortgage on real estate located in Orlando, Florida.  (Dkt. 15, Dougherty Aff., ¶ 4; Dkt. 63, Dougherty Aff., ¶ 4; Dkt. 6, Joint Answer, Affirmative Defenses and Counterclaims of OSM and BF-Negev ("Joint Answer") at 7, ¶ 41.)

2.      The Grande Palisades Loan was a construction loan participated to over 60 participant financial institutions, including The Columbian Bank and Trust Company out of Topeka, Kansas ("Columbian Bank"), which purchased from Marshall a 4.28571429% participation interest in the Grande Palisades Loan pursuant to an April 30, 2007 written agreement (the "Grande Palisades Participation Agreement").  (Dkt. 15, Dougherty Aff., at ¶ 4; Dkt. 6, Joint Answer at 7, ¶ 43.)

3.      Since 2009, OSM alleges that it stands in the "shoes" of Marshall as the lead "Lender" with respect to enforcing the Lender's rights under the Participation Agreement and was the loan servicer for the Grande Palisades Loan.  (Dkt. 6, Joint Answer at 13, ¶ 67; *id.* at 22-23, ¶ 8; Dkt. 15 at ¶¶ 9-10.)

4.      On August 22, 2008, the Columbian Bank was closed.  (Dkt. 10-1 at 2, Wheatly Aff. at Ex. 1; Dkt. 6 at 8, ¶ 48.)  The Federal Deposit Insurance Corporation ("FDIC") was named the Receiver and succeeded to all of the rights, titles, and interest in and to the assets of Columbian Bank, including the Grande Palisades Participation

4

Agreement.  (Dkt. 6 at 24, ¶ 18.)  The FDIC, acting in its capacity as Receiver for Columbian Bank, will occasionally be referred to as the FDIC-R.  The FDIC-R did not pay any Advances or Extraordinary Expenses that OSM alleges Columbian Bank was obligated to pay.  (*Id.* at 9, ¶ 51; Dkt. 63, ¶¶ 17-22.)

5.      In September of 2008, a number of the other Grande Palisades Loan participants (the "Contributing Participants") agreed to fund the shortfall, caused by Columbian Bank not paying its share of Advances, pursuant to a Funding Agreement. (Dkt. 6, Joint Answer at 9, ¶ 50; *see also id.* at 10, ¶ 57; Dkt. 10-1 at 35, Wheatly Aff., ¶¶ 14-17, Ex. 6, Funding Agreement.)  Pursuant to the Funding Agreement, Marshall succeeded to Columbian Bank's Participation interest up to the extent of Columbian Bank's shortfall and that interest constituted a retained interest under the Grande Palisades Participation Agreement.  (Dkt. 10-1 at 37-38.)  Retained Interests in Columbian Bank's Participation were sold to the Contributing Participants on a permanent basis and without any right being retained by OSM's predecessor(s) in interest to reacquire the participation interests of Columbian Bank which were thereby being sold.  (Dkt. 10, Wheatly Aff., ¶¶ 14-17 and Ex. 6, Funding Agreement.)

6.      As a result of the Funding Agreement, and the assignment of participation interests formerly owned by Columbian Bank to the Contributing Participants, the Lender for the Grande Palisades Loan started accounting for the Columbian Bank's participation interest as having been reduced from 4.28571429% to 2.12424110% of the Grande Palisades Loan.  (Dkt. 10, Wheatly Aff., ¶ 17.)  Indeed, the remaining financial

institutions participating in the Grande Palisades Loan started receiving documents, requests for funding Advances, requests for paying Extraordinary Expenses, and disbursements from the Lender and loan servicer reflecting this permanent reduction in Columbian Bank's participation interests.  (*Id.*)

7.    On September 30, 2009—over a year after the FDIC-R started acting as receiver for the Columbian Bank—LNV entered into a Loan Sale Agreement by and between the FDIC-R and LNV.  (Joint Answer at 12, ¶ 64.)

8.    The September 30, 2009 Loan Sale Agreement between the FDIC-R and LNV included an "Attachment 'D'" which sets forth the specific terms of the assignment between the FDIC-R and LNV.  (Dkt. 10-1, Wheatly Aff., ¶¶ 7-9, Ex. 2.)   This "Assignment and Assumption of Interests and Obligations" document provided information regarding the specific terms of the assignment between the FDIC-R and LNV, and expressly included the terms upon which LNV was willing to, and did, take an assignment from the FDIC-R with respect to Columbian Bank's Participation in the Grande Palisades Loan.  (Dkt. 18, Sup. Wheatly Aff., ¶¶ 5-6, Exs. 7-8; *see also* Dkt. 10, Wheatly Aff., ¶ 8, Ex. 2, executed "Assignment and Assumption of Interests and Obligations," dated September 30, 2009, attached to the Loan Sales Agreement as "Attachment 'D.'")

9.    Because the fully executed "Assignment and Assumption of Interests and Obligations" expressly states that LNV was accepting "***all Obligations arising from and after the date hereof***," LNV understood the price and other terms were based on LNV

not accepting any "Obligations" that had arisen prior to the September 30, 2009 effective date of the parties' agreements.  (Dkt. 10, Wheatly Aff., ¶¶ 7-8, Ex. 2 at "Attachment 'D,'" emphasis added.)   Significantly, the defined term, "Obligations," is limited to Obligations of the **Seller** (*i.e.*, the FDIC-R) under both the terms of the Loan Sale Agreement between the FDIC-R and the Assignment and Assumption Agreement attached to it**.**  (Dkt. 18-1, Supp. Wheatly Aff., Ex. 7 at 6; *id.*, Ex. 8 at D-2.)

10.     As demonstrated by OSM's admission that the FDIC-R did not fund any of the "obligations" owed by Columbian Bank under the Grande Palisades Participation Agreement (Dkt. 63, Dougherty Aff., ¶¶17-22), and OSM's complete failure to produce any facts demonstrating the FDIC-R assumed any such obligations, it is undisputed the FDIC did not assume any obligations under the Grande Palisades Participation Agreement and, therefore, no "Obligations" could have been assigned to LNV under the Loan Sale Agreement or the Assignment and Assumption Agreement.  (Dkt. 18-1, Supp. Wheatly Aff., Exs. 7-8 .)

11.     The fact that the "Assignment and Assumption of Interests and Obligations" expressly states that LNV was accepting only "**Obligations arising from and after the date hereof**," was a material term to LNV as LNV did not know whether any payments required under the agreement had been made since before the August 22, 2008 closing of Columbian Bank, and LNV would not have purchased an assignment of assets from the FDIC-R if it had included "Obligations" that pre-dated the September 30, 2009 "Assignment and Assumption of Interests and Obligations."  (*Id.*)

## DISPUTED ISSUES OF MATERIAL FACT

**A.    The Fraudulent Inducement of Participants—Including Columbian Bank.**

1.    Marshall entered into over 60 participation agreements with financial institutions to spread the risk associated with the $140,000,000 construction loan to Lake Austin.  One of those participation agreements was the Grande Palisades Participation Agreement with Columbian Bank.  (Dkt. 6-1.)  However, all of the participation agreements with the 60 plus participants were essentially identical.

2.    The Grande Palisades Participation Agreement provides that the "terms and conditions" of the loan agreement between Marshall Bank and Lake Austin were to be "identified on or attached" as "Exhibit A."  (Dkt. 6-1 at 3.)  The Grande Palisades Participation Agreement attached to OSM's Answer does not, however, reflect any "Exhibit A."  (*See generally*, Dkt. 6-1.)  Nor does the Grande Palisades Participation Agreement attached to the Brian Dougherty Affidavit contain an "Exhibit A."  (Dkt. 91, Ex. 9.)  Accordingly, the summary judgment record does not include a complete copy of the contract at issue.

3.    Nonetheless, the "terms and conditions" of the loan between Marshall and Lake Austin specifically included a term requiring the Borrower to fund a portion of the costs of constructing the 890 unit condominium project with its own Equity—

specifically, $30,024,906.00.[2]  This is referred to as having "skin in the game."  Having "skin in the game" is required by lenders because it demonstrates the borrower is willing to risk its own money in the same project.  (Aff. of James Erwin in Opp. to Sum. J., dated July 29, 2014 ("Erwin Aff."), ¶ 7.)  Without an obligation by the borrower to risk its own money, lenders are simply unwilling to fund projects of this magnitude.  (*Id.*)  Indeed, lenders rely on borrower's own understanding of the risks associated with projects in determining whether the risk of loaning money on such projects is prudent.  (*Id.*)

4.      Because participants in loans are acting as lenders by funding portions of the loan amount, participants also rely on borrowers to have "skin in the game."  (Erwin Aff., ¶ 8.)  Because participants do not have direct access to the underlying borrower— except through the information provided by the Lead Lender—participants reasonably rely on the Lead Lender to accurately report the terms and conditions of the underlying loan as well as deviations from those written terms and conditions (if any).  (*Id.*)  This remains true during the entire course of a participation relationship, but is especially true at the time when the participation relationship originates as well as when a participant is asked to fund the loan commitment to the borrower.  (*Id.*)

5.      The Grande Palisades Participation Agreement reflects these principles.

---

[2] The "Construction Loan Agreement" requires total "Equity" from the Borrower for the Project to be $74,870,756.00, comprised in part by $30,024,906.00 as proceeds of the "Subordinated Loan," which was made to the Borrower by H&O, LLC, an entity formed by Paul Oxley and Martyn Harrison, who were "Individual Guarantors" under the terms of the Construction Loan Agreement.  (Schoenwetter Aff., Ex. 3, Construction Loan Agreement at 1, 5 and 10; *see also* Affidavit of Cecelia Borenko, dated Sept. 23, 2013 ("Borenko Aff."), ¶ 16.)

(Erwin Aff., ¶ 10.)  Indeed, that agreement—drafted by OSM's predecessors—provides:

> Participant has thoroughly reviewed **the Credit Agreements** and those documents **contain all the terms and conditions that the Participant considers to be material** to the Credit **and upon which the Participant has relied** in purchasing its interest in the Credit, and Participant approves the form and content of the Credit Agreements.

(Dkt. 6-1 at § 2.1(f), emphasis added; *see also* Erwin Aff., 11.)

6.       The terms of the Grande Palisades Participation Agreement assured LNV and its predecessors that the Lender (*i.e.*, Marshall/OSM) would be the only source of information that could be relied upon for information regarding the Grande Palisades Loan or the Borrower (*i.e.*, Lake Austin, referred to as the "Obligor" in the participation agreement).  The agreement provides:

> Participant will not contact the Obligor or any other Credit provider (or potential credit participant or provider) either via mail, telephone, fax, email or in person without the prior written consent of Lender, which consent will not be unreasonably withheld.

(Dkt. 6-1 at § 2.1(l), *see also* Erwin Aff., ¶ 10.)[3]

7.       With these foundations in place, Marshall/OSM fraudulently induced participants like Columbian Bank to purchase 100% of the very risky $140,000,000 construction loan—while Marshall/OSM concealed material facts, obtained the $25,000,000 necessary to pay-off a previous loan, and continued charging a servicing fee

---

[3] This provision is strictly enforced.  (*See* Affidavit of C. Schoenwetter in Opposition to Summary Judgment ("Schoenwetter Aff."), ¶ 2, Ex. 1, June 4, 2014 cease and desist letter from A. Hartman to C. Schoenwetter citing to §2.1(l) of the Grande Palisades Participation Agreement; *id.*, ¶ 3, Ex. 2, June 16, 2014 letter from C. Schoenwetter to A. Hartman responding to earlier cease and desist letter.)  However, when permission to contact others was requested by LNV in order to "audit" OSM's accounting for the underlying loan, no consent was provided.  (*Id.*, ¶ 4.)

to the participants.  (Dkt. 81-1, Borenko Aff., ¶¶ 20, 26; Dkt. 6-1 at 6 of 62, definition of "Servicing Fee.")

8.    The Affidavit of Cecelia Borenko provides the details as observed by a former Marshall/OSM employee who worked in Marshall's Orlando, Florida office from mid-2004 through approximately August of 2008 as an Assistant Vice President and Financial Analyst.  (Dkt. 81-1, Borenko Aff., ¶¶ 1-2.)  Ms. Borenko was directly responsible for administering the $140,000,000 Grande Palisades Loan and associated mortgage.  (*Id.*, at ¶ 3.)  In that capacity, her responsibilities involved "all actions related to the financial analysis" of the Grande Palisades Loan, "monitoring construction," and "obtaining post-closing items."  (*Id.*)  Her responsibilities also required her to work with the loan documentation, cultivate a relationship with the Borrower (Lake Austin Properties I, Ltd.), and prepare the marketing materials sent by Marshall to prospective participants (the "Book") in the Grande Palisades Loan.  (*Id.*, ¶ 5.)

9.    Ms. Borenko explains that she, and other Marshall employees, had "plenty of evidence, before any funds were advanced," that the Borrower and its principals had:

A.    "[N]ot complied with the Loan requirements";

B.    Had "made improper payments with Grande Palisades deposits"; and

C.    Used deposits from at least two other Lake Austin projects (*e.g.*, Avalon and Magnolia) to fund Grande Palisades.[4]

---

[4] Lake Austin pursued several separate condominium projects on adjoining properties (*i.e.*, Grande Palisades, Palisades, Avalon and Magnolia Woods).  (Dkt. 91, Dougherty Aff., Ex. 7 at OSM026601.)  OSM's predecessors in interest in the Grande Palisades Loan acted as the lender for the Grande Palisades and Palisades projects.

(Borenko Aff., ¶ 26.)

10.    Ms. Borenko gathered the marketing materials that comprised the Book for the Grande Palisades Loan which would then be approved by an internal committee of Marshall employees including Stephanie Lunde, Paul Eckholm, and other senior management at Marshall, before being sent back to Ms. Borenko.  (*Id.*, ¶ 5.)

11.    The Book used to market the Grande Palisades Loan to prospective participants specifically stated that $30 million in Subordinated Debt (*i.e.*, Borrower Equity a/k/a "skin in the game") was furnished by "***related third parties***."  (*Id.*, ¶ 9, emphasis added.)

12.    The "related third parties" was a reference to H&O, LLC, an entity formed by Paul Oxley and Martyn Harrison, who were Individual Guarantors under the terms of the Construction Loan Agreement.  (Schoenwetter Aff., Ex. 3, Construction Loan Agreement at 1, 5, and 10; Borenko Aff., ¶ 16.)  Ms. Borenko was familiar with Paul Oxley through her work as a credit analyst at another institution before joining Marshall. (Borenko Aff., ¶ 3.)  She was personally familiar with both Individual Guarantors of the Grande Palisades Loan (Paul Oxley and Martyn Harrison) through her direct involvement administering the financial documents in connection with the Grande Palisades Loan. (*Id*, ¶ 15.)  Based on this personal knowledge, Ms. Borenko was "very skeptical" of the ability of those guarantors to fund any meaningful portion of the $30 million in Equity required under the terms of the Construction Loan Agreement.  (*Id.*; *see also* Schoenwetter Aff., Ex. 3, Construction Loan Agreement at 5 and 10.)  Indeed, based on

financial documents the Borrower and Individual Guarantors provided to Ms. Borenko, she was not able to verify the source of the funds used by the Borrower.  (Borenko Aff., ¶¶ 15-19.)

13.    A copy of the "Book" Stephanie Lunde and OSM produced as part of the discovery process in OSM's Florida Foreclosure Action, demonstrates the "Book" produced in discovery had been materially altered (the "OSM Book").  (Borenko Aff., ¶¶ 6-7.)  The OSM Book states the $30 million in subordinated debt was provided by "*unrelated third parties*." (*Id.*, ¶ 9.)  Further, the OSM Book removed all references to Ms. Borenko and a fellow Marshall employee named Eric Johnson.  (*Id.*, ¶ 8.)  Ms. Borenko understands the OSM Book, with its significant changes, was not used to solicit prospective participants during her employment with Marshall, which ended over a year after Columbian Bank signed the Grande Palisades Participation Agreement.  (*Id.*, ¶¶ 2, 9-10; Dkt. 6-1, Joint Answer, Ex. 1 at 2.)[5]

14.    Ms. Borenko made numerous attempts to substantiate that the $30 million in Subordinated Debt used to satisfy the Borrower's Equity requirement was legitimate because substantiating documentation had not been provided to Marshall at the Grande Palisades Loan closing.  (Borenko Aff., ¶ 16.)  For example, she asked Oxley for documentation to establish the source of the $30 million, but was "never able to get a

---

[5] Presumably, the Book was sanitized to eliminate Borenko's name so no one would contact her, and also to conceal the fact that $30 million in Equity (*i.e.*, "skin in the game") was supposed to be furnished by affiliates of the Borrower who did not possess the financial ability to provide such funding.  (Borenko Aff., ¶¶ 7-10, 15.)  LNV separately notes that Ms. Lunde was an employee of Marshall and was also an officer of OSM.  (Borenko Aff., ¶¶ 3, 11; Dkt. 15-1, Dougherty Aff. at 10.)

satisfactory response from Oxley." (*Id.*)  Ms. Borenko also made efforts to obtain corporate documents for H&O, LLC in order to establish the source of the $30 million. (*Id.*)  Again, no documentation was provided.  (*Id.*)  Ms. Borenko reports that in all her years dealing with Oxley, there was "never any evidence on Oxley's personal financial statements that he had anywhere near $30 million in liquidity."  (*Id.*, ¶ 17.)

15.     According to the financial documents ultimately received from Oxley, it did not appear that the Individual Guarantors, H&O, LLC, or the Borrower, put up $30 million—"they did not have that kind of liquidity."  (Borenko Aff., ¶ 19.)  Ms. Borenko concluded, based on the financial documents made available to her, that the Borrower's $30 million contribution came from deposits made by purchasers of condominium units from other Lake Austin projects—including the Avalon and Magnolia Woods projects. (*Id.*, ¶¶ 19, 21.)

16.     Ms. Borenko explained there was a "definite link" between the Grande Palisades Loan and another loan Marshall had made to the same Borrower referred to as the Palisades Loan.  (*Id.*, ¶ 20.)  "The Grande Palisades Loan required a total payment of $25.0 million to be paid to reduce the Palisade Loan, of which about $15.9 million was to be funded from loan proceeds" and the balance from equity put into the Grande Palisades Project by the Borrower in the form of Equity.  (*Id.*)  If the Grande Palisades Loan was not closed and funded, Marshall would not be paid back approximately $25 million because the Palisades Loan "could not have been repaid from the unit sales of the Palisades property" as the expected proceeds from the sale of all units in that project

would leave a deficit of approximately $24 million, and Marshall had been unable to sell participation interests in the remaining 33% of the Palisades Loan and, thus, had retained a 30% interest in that loan. (*Id.*) Significantly, Ms. Borenko explained "the Grande Palisades Loan would repay Palisades lenders, which included Marshall, particularly since as of the time [she] left Marshall, Marshall did not retain any interest in the Grande Palisades Loan." (*Id.*)

17.     Marshall and OSM continued to conceal their fraud even as the Grande Palisades Loan was funded through Advances paid by Participants. For example, OSM never disclosed to Columbian Bank, the FDIC-R, LNV, or any of the other participants, that the Borrower did not furnish the $30 million in equity from "***related third parties***" as required.

18.     In order to address these serious "problems" regarding the Grande Palisades Loan, Ms. Borenko wrote a lengthy memorandum to Stephanie Lunde, dated April 18, 2008, which included voluminous attachments (the "Borenko Memorandum")—before any "First Draw" funds were advanced. (Borenko Aff., ¶ 22.) Ms. Lunde told Ms. Borenko that "whether the Borrower, Oxley, and Harrison were in compliance with the [Grande Palisades] Loan was a legal issue, and as such, Marshall's legal department should handle it." (*Id.*, ¶ 23.) Ms. Borenko then sent the Borenko Memorandum to Mark Kruger in Marshall's legal department and spoke with Mr. Kruger about her concerns. (*Id.*, ¶ 23-24.) Ms. Borenko was "astonished" to observe that the Grande Palisades Loan moved forward and that Advances were made to the Borrower. (*Id.*, ¶ 25.)

15

19.    The facts set forth in Ms. Borenko's Affidavit are substantiated by the detailed interrogatory responses of Malbec Investment, LLC ("Malbec") signed under oath by Stephen Mann and submitted to the court in OSM's Florida Foreclosure Action involving the property mortgaged in support of the Grande Palisades Loan.  Malbec explained the facts supporting its allegation that Lake Austin (*i.e.*, the Borrower in the Grande Palisades Loan) misused deposits by individuals purchasing condominium units in other Lake Austin projects to fund the $30 million Borrower's Equity required for the Grande Palisades Loan—with the knowledge, consent and active involvement of Marshall.[6]  Malbec detailed Marshall's motive, opportunity, and purpose in violating Florida law prohibiting the use of deposits on condominium sales to pay-off loans on unrelated projects.  (*Id.*)  Malbec's response cites to deposition testimony of Stephanie Lunde, accounting documents from third-party banks, and documents produced by OSM, as well as other sources.  (*Id.*)  In part, Malbec explained:

> [Marshall] did whatever it had to do in order to close the Grande Palisades Loan.  Not only did it ignore misuse of buyers' deposits, it "cooked the books" to make Lake Austin look like a creditworthy borrower.  These initiatives came not from Paul Oxley or Lake Austin, but from [Marshall]. Financial statements submitted by Lake Austin to [Marshall] from its original accountant documented that Lake Austin could not meet underwriting requirements because it had no equity and no cash to put down, other than from Purchase Deposits.  Upon receipt of these financials . . . Eric Johnson [of Marshall] required that Lake Austin change accountants to one designated by [Marshall] who would issue financials that misrepresented Lake Austin's position in a manner designed to satisfy underwriting criteria.

---

[6] Schoenwetter Aff., Ex. 7, Malbec's Answers to Interrogatories from OSM, at 2-9.

16

Moreover, [Marshall] contrived a scheme to require Lake Austin to use over $30,000,000 of purchase deposit money, including Avalon and Magnolia deposits, to create $30.0 million of equity out of thin air. This was accomplished by disguising these deposits as a new Grande Palisades "subordinate debt" allegedly made by an Oxley-owned company, H&O, LLC. H&O, LLC was established on November 20, 2006 (*see* FL Secretary of State Document #10600011255) just days prior to the originally scheduled closing date. However, the funds for the Subordinate Debt were confirmed by [Marshall] as being actually Purchase Deposits on December 31st, 2006 (*see* the [Marshall] Equity Verification to Date spreadsheet, and corresponding CNLBank verification of account #████ previously produced by Lake Austin in response to Plaintiff's First Requests for Production of Documents in Aid of Execution). [Marshall] re-confirmed that these Subordinate Debt funds were actually Purchase Deposit funds at least four separate times in writing from CLNBank. As a just week old company, H&O never had any funds or revenue, and the entirety of the approximately $30,000,000 Subordinate Debt was actually Purchase Deposit Funds (including Avalon and Magnolia Woods) (*see* CNLBank, Lake Austin Properties I, Ltd. Excess Deposit Escrow Account Number ████ statements). Thus the subordinate debt was a total sham.

(*Id.*, Malbec Interrogatory Response No. 3 at 6-7.) Malbec concluded its interrogatory response explaining:

In sum, [Marshall] knew that (i) Lake Austin had no equity, (ii) all funds purporting to be equity came from Purchaser Deposits, (iii) some of those deposits were from Avalon and Magnolia Woods purchasers, (iv) [Marshall] was a direct beneficiary of $14,873,431.56 of these funds in the form of collected fees, and pay down of their exposure on a completely different non-performing loan they were carrying, and (v) deposits were used for purposes not permitted by Florida law.

(*Id.*, at 8.)

20.    Additionally, Malbec's Interrogatory Responses provided detailed facts demonstrating Marshall either participated in, or condoned, violations of Florida law:

Purchasers of condominium units to be erected at the subject property of Grande Palisades, along with the nearby properties of Avalon and Magnolia Woods put down an average deposit of approximately twenty-eight (28%) percent of their Purchase Price. All of this money was required by law to be put in escrow. In fact, only 10 (10%) [(sic)] percent was ultimately escrowed and the balance was put in an account which was not an escrow account[.] . . . This was done with the full knowledge of [Marshall], which received bank statements and at some point, even took control of the accounts through CF Capital Partners, the Managing Agent it designated to run the Grande Palisades Property (See the CNLBank statements of Lake Austin account ██████ for each deposit of 10%, and CNLBank statements for Lake Austin Properties I, Ltd. Excess Deposit Escrow Account ██████ for the balance of the Purchase Deposits over 10%. [(Footnote omitted.)] Florida law requires that all Purchase Deposit funds above ten (10%) percent of the purchase price be used only for actual construction.

Specifically Florida Statute 718.202(3) requires that: *"no part of these funds may be used for salaries, commissions, or expenses of salespersons or for advertising purposes."* [(Emphasis in original.)] Despite these State mandated requirements, during the underwriting period, and prior to the closing of the [Grande Palisades Loan] Lake Austin informed [Marshall] that as part of the contract with the sales agent in the U.K., a Commission of 10% of the Purchase Price was due and payable at signing of the contract (as opposed to the usual practice of paying brokers only upon closing of the purchases). This 10% payment was made directly to the brokers for each Contract signed, and the funds were never put into the so-called Excess Deposit Escrow Account. Although such payments were blatantly illegal, [Marshall] acknowledged the payments and ratified them by including a line item of $28,000,000 in their underwriting budget . . . [.]

***We haven't seen the balance of the Lake Austin files, which were copied for OSM, who has refused to share them with us, but the copies from the files we do have, which includes some [Marshall] underwriting checklists, indicate that the sales and marketing expenses were reported as "Borrower Equity."***

(Schoenwetter Aff., Ex. 7, Malbec Interrogatory Response No. 3 at 2-3.)

21.    Malbec's General Counsel, Stephen Mann, submitted a sworn affidavit further demonstrating Marshall/OSM engaged in fraudulent activities and also

participated in, ratified, and/or condoned, the misuse of buyer deposits under Florida law.

(*See generally*, Schoenwetter Aff., Ex. 5, Affidavit of Stephen Mann, ("Mann Aff.").)

Among other things, the letter/memorandum attached as Exhibit B to the Mann Affidavit

from Malbec to OSM explains, in part:

> Almost all of the purchasers posted deposits of 25%-30% of the purchase price.  You will be aware that Florida Statute 718.202 requires that any deposit on condominium units be placed into escrow.
>
> The Statute provides that "*Any developer who willfully fails to comply with the provisions of this section concerning establishment of an escrow account, deposits of funds into escrow, and withdrawal of funds from escrow is guilty of a felony of the third degree . . . [.]  The failure to establish an escrow account or to place funds in an escrow account is prima facie evidence of an intentional and purposeful violation of this section.*"  [(Emphasis in original.)]  Of the $156,400,000 collected from the purchasers, only $54,000,000 ever ended up in an escrow account.  * * * But the unescrowed funds were used, among other things, for the following unlawful purposes:
>
> 1. A total of $57,100,000 was paid in commissions to IAP.  Florida statutes strictly prohibits the paying of sales commissions out of deposit funds.  718.202, subsection 3 reads:  "*no part of these funds may be used for salaries, commissions, or expenses of salespersons or for advertising purposes.*"  [(Emphasis in original.)]  Borrower's records show that Marshall Bank had knowledge of, and gave approval for, these payments.
>
> 2. Marshall Bank required a $4,560,000 "Origination Fee."  Since Marshall knew that its Borrower did not have these funds available from other sources, they were aware the money came from down payments.
>
> 3. $9,100,000 as paid to BankFirst as a Partial release on Palisades ("Parcel A").  * * *  A review . . .  shows that these funds came in their entirety from Purchasers of Grand[e] Palisades and the other properties, not from Purchasers of Palisades.

(*Id.*, at Ex. B.)

22.     The sworn affidavit of Stephen McKenzie provides additional corroboration.  Mr. McKenzie confirms purchase deposits were used for improper purposes by Marshall—including the use of "$30,000,000 of purchase deposits . . . used in a scheme by [Marshall/OSM] and Lake Austin to circumvent the minimum standard underwriting requirements [of the Grande Palisades Loan], by presenting the Purchaser deposit money as 'Sub-Debt' cash equity of the borrower[.]"[7]  Mr. McKenzie further testified "[Marshall/OSM] had structured the loan for the Grande Palisades with no money down from the borrower and knew that all equity put into the project purported to be borrower equity, was actually deposit money from the purchasers of the Grande Palisades, Avalon, and Magnolia Woods projects[.]"  (*Id.*, McKenzie Aff., ¶ 10(f).)

23.     Significantly, Mr. McKenzie confirms that "in the process of closing the loan on Grande Palisades with the participating lenders, [Marshall/OSM] actually paid $14.9 million in Grande Palisade loan funds . . . to pay down their own exposure in a loan they held on the Palisades project."  (*Id.*, ¶ 10(g).)  Accordingly, ***[Marshall/OSM] removed itself from any ownership in the Grande Palisades Loan and "transferred any financial risk of a 'no money down' unfunded loan to the participants"—including Columbian Bank***.  (*Id.*, emphasis added.)

---

[7] *See* Schoenwetter Aff., Ex. 6, Affidavit of Stephen McKenzie, dated Feb. 1, 2013 (the "McKenzie Aff.") at ¶ 10(d).

## ARGUMENT

**I.    The standard for summary judgment supports denial of Defendants' motion.**

Summary Judgment is not an acceptable means of resolving triable issues. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial responsibility of demonstrating there is no genuine issue of material fact to be decided. *Celotex Corp.*, 477 U.S. at 323. In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**II.    Summary judgment should be denied or deferred under Rule 56(d) as discovery is not complete and LNV has demonstrated additional discovery is necessary.**

Rule 56(d) permits a Court to deny a motion for summary judgment when "a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d); *see also In Re Levaquin Prods. Liab. Litig.*, 726 F. Supp. 2d 1025, 1038 (D. Minn. 2010) (denying summary judgment because further discovery was required); *Shqeirat v. U.S. Airways, Group Inc.*, 515 F. Supp. 2d 984 (D. Minn. 2007) (granting motion under former Rule 56(f) and allowing moving party to conduct further discovery). Thus, Rule 56(d) "allows a summary

judgment motion to be denied . . . if the nonmoving party has not had an opportunity to make full discovery." *Celotex Corp.*, 477 U.S. at 326.

LNV asserted its fraud-based defenses only recently, in its April 1, 2014 Answer to OSM's Counterclaims. (*See* Dkt. 81.) Facts supporting LNV's fraud defenses have yet to be fully developed. (*See* Schoenwetter Aff., ¶¶ 13-25, Exs. 11-13.) Given the fact discovery ends in three months on October 23, 2014, and the present motion was filed approximately three months after LNV first asserted its fraud-based defenses, additional time should be allowed for discovery of LNV's defenses. This is consistent with the purpose of Rule 56(d) which was designed to ensure that a party opposing summary judgment is provided adequate time for discovery. *Ray v. Am. Airlines, Inc.*, 609 F.3d 917, 923 (8th Cir. 2010); *Nolan v. Thompson*, 521 F.3d 983, 986 (8th Cir. 2008).

To the extent this Court finds LNV has not yet demonstrated a triable issue of fact regarding whether OSM or its predecessors fraudulently induced Columbian Bank to enter into the Grande Palisades Participation Agreement, then LNV should be allowed to conduct further discovery. The further discovery sought by LNV is detailed in the Affidavit of Charles Schoenwetter submitted in opposition to the pending motion. (Schoenwetter Aff., ¶¶ 13-18, Exs. 11-13.) In pertinent part, LNV seeks the following discovery:

**Depositions**—based upon the affidavits of Cecelia Borenko, Stephen Mann, and Stephen McKenzie, LNV seeks to depose each of those individuals as they possess knowledge directly relating to LNV's fraudulent inducement defense. Deposition notices

for each of those individuals have already been served.  (Schoenwetter Aff., ¶¶ 13-16.)
Based on the information provided from the Borenko Affidavit, LNV also served
deposition notices for the following individuals who possess knowledge relating to
LNV's fraudulent inducement defense:  (1) Stephanie Lunde; (2) Eric Johnson, (3) Paul
Eckholm; and (4) Mark Kruger.[8]  (*Id.*)  Further, LNV will seek to depose one or more
representatives of the now defunct Columbian Bank, including the individual who signed
the Grande Palisades Participation Agreement, Chris J. Urban.  (*Id.*)

**Documents**—based on the numerous affidavits and discovery responses filed in
connection with OSM's Florida Foreclosure Action involving the property serving as
collateral for the Grande Palisades Loan, LNV seeks, among other things, the following
documents:  (1) the "Book" and the "OSM Book"[9] described in the Borenko Affidavit;
(2) transcripts (and associated exhibits) from depositions taken of Stephanie Lunde,
Stephen Mann, Stephen McKenzie, and John Urban, as well as others deposed in OSM's
Florida Foreclosure Action; (3) copies of the written discovery response (and
corresponding documents) exchanged by the parties in OSM's Florida Foreclosure
Action; (4) the business records of the Grande Palisades property owner and Borrower,
previously in the custody of Paul Oxley, that were produced by the U.S. Department of

---

[8] These individual were identified by Ms. Borenko as working for Marshall.  At least one
of them, Stephanie Lunde, also worked with OSM.  LNV has served discovery on OSM
seeking current contact information for each of these individuals for purposes of serving
subpoenas—if needed.

[9] In the Borenko Affidavit, the "OSM Book" is referred to as the "Lunde Book."

Justice on thumb drives during OSM's Florida Foreclosure Action;[10] (5) the Borenko Memorandum and attachments sent to Stephanie Lunde by Ms. Borenko on or about April 18, 2008 describing Ms. Borenko's serious concerns about the Grande Palisades Loan and all documents that refer or relate to the Borenko Memo; (6) all documents referring to, or relating to, the Borrower's Equity and/or the Subordinate Loan referenced in the Grande Palisades Construction Loan Agreement, including but not limited to all underwriting checklists; and (7) all documents that refer to, relate to, and/or constitute an assignment of any rights OSM claims to possess vis-à-vis the Grande Palisades Loan and/or the Grande Palisades Participation Agreement.  These and other documents have been requested in discovery from OSM.  (Schoenwetter Aff., ¶ 17, Ex. 11.)  These documents are necessary in order to further develop LNV's defenses, including its fraud-based defenses, to OSM's counterclaims.

It is expected that discovery sought by LNV as enumerated above, and in the Schoenwetter Affidavit, will provide additional information and specific facts to further rebut OSM's allegation that there are no disputed issues of fact precluding entry of partial summary judgment.

---

[10]  Malbec's Renewed Motion to Intervene in OSM's Florida Foreclosure Action references these documents on page 4.  *See* Schoenwetter Aff., Ex. 8.

III.    **The fraudulent inducement of the Grande Palisades Participation Agreement
renders it voidable and, therefore, it is inappropriate to limit LNV to its
contract-based claims.**

LNV's affirmative defense of fraudulent inducement, (Dkt. 81 at 16, ¶ 20), renders
OSM's motion for partial summary judgment a nullity. Under New York law, fraudulent
inducement of a contract renders it voidable at the option of the defrauded party—in this
case, LNV. Because the Grande Palisades Participation Agreement may be rendered
void, it is inappropriate to limit LNV's claims to breach of contract and declaratory
judgment causes of action as argued by OSM.

A.    Fraudulent Inducement Renders a Contract Voidable.

Under New York law, "[i]t is clear . . . that fraud in the inducement renders a
contract voidable, not void." *Chase Manhattan Bank, N.A. v. Finger Lakes Motors, Inc.*,
423 N.Y.S.2d 128, 130 (N.Y. Sup. Ct. 1979); *see also McCaddin v. Southeastern Marine,
Inc.*, 567 F. Supp. 2d 373, 384 (E.D.N.Y. 2008) ("a defense of fraudulent inducement
'renders contracts voidable, but not void'"). A voidable contract "binds one party, but
not the other, who may ratify or rescind it at pleasure." *Finger Lakes Motors, Inc.*, 423
N.Y.S.2d at 129. Accordingly, a "voidable contract is valid and binding until it is
avoided by the party entitled to avoid it." *Id.*

In the present case, due to the fraudulent inducement of OSM's predecessor in
interest, Marshall, as well as the ongoing fraudulent concealment of OSM, LNV may
avoid (*i.e.*, rescind) the Grande Palisades Participation Agreement at its pleasure. *Id.*
Thus, LNV is not relegated to pleading only breach of contract and declaratory judgment

claims, and may assert its other claims as well.

For example, in *Ox v. Union Cent. Life Ins. Co.*, the court permitted the plaintiff to plead an unjust enrichment claim despite the existence of an express agreement that governed the dispute, because the plaintiff also alleged a fraudulent inducement claim. No. 94 Civ. 4754(RWS), 1995 WL 634991, at *5–*6 (S.D.N.Y. Oct. 27, 1995). The Court explained that "as long as a factual issue remains as to the fraud claim, recovery under a theory of unjust enrichment may be proper, even in the presence of an alternative breach of contract claim." *Id.* at *6; *see also Wilk v. VIP Health Care Servs., Inc.*, No. 10 Civ. 5530(ILG)(JMA), 2012 WL 560738, at *5 (E.D.N.Y. Feb. 21, 2012) ("a quantum meruit claim may be alleged alongside a breach of contract claim where, as here, the parties dispute the existence or validity of the alleged contract"); *Net2Globe Intern., Inc. v. Time Warner Telecom of New York*, 273 F. Supp. 2d 436, 466 (S.D.N.Y. 2003) (alternative claim for unjust enrichment allowed due to validity of the parties' contracts being in dispute as a result of fraudulent inducement claim).

In the recent case of *Lefkowitz v. Reissman*, the court first recognized the general principle that under Fed. R. Civ. P. 8(d) parties may plead in the alternative. No. 12 Civ. 8703(RA), 2014 WL 925410, at *12 (S.D.N.Y. Mar. 7, 2014). Then, the court determined that because "'a factual issue' remains as to the fraudulent inducement claim, the contract [at issue] is potentially voidable" and, therefore, concluded the plaintiff was allowed to plead an unjust enrichment claim "as an alternative to [his] breach of contract claim." *Id.*

B.     Legal Standard for Fraudulent Inducement.

In the present case, the record evidence demonstrates that OSM, through its predecessors in interest, fraudulently induced the Grande Palisades Participation Agreement.  The essential elements of a cause of action sounding in fraudulent inducement or misrepresentation in the making of a contract are: (1) a false representation of a material fact, and (2) reasonable reliance thereon by the plaintiff, (3) to his detriment.  *U.S ex rel. Roman v. Schlesinger*, 404 F. Supp. 77, 85 (E.D.N.Y. 1975) citing *Sabo v. Delman*, 3 N.Y.2d 155, 164 N.Y.S.2d 714, 143 N.E.2d 906 (1957).[11]  "The misrepresentation is deemed material if it concerns a fact likely to influence the decision-making process [(citations omitted)], *i.e.*, if the non-disclosure constituted an essential inducement to bargain."  *Schlesinger*, 404 F. Supp. at 85-86.

C.     The Facts of this Case Demonstrate a *Prima Facie* Case of Fraudulent Inducement.

1.     A material misrepresentation was made.

The facts demonstrate a *prima facie* case of fraudulent inducement.  First, by sharing with the participants—including Columbian Bank—that the Borrower would be putting $30 million of its own Equity into the Grande Palisades Project through a related third-party, OSM's predecessors in interest (*e.g.*, Marshall) made a misrepresentation of

---

[11] *See also, Ge Dandong v. Pinnacle Performance Ltd.*, 10 Civ. 8086 (JMF), 2013 WL 5658790, at *8 (S.D.N.Y. Oct. 17, 2013) ("To state a claim for common law . . . fraudulent inducement under New York law, a plaintiff must demonstrate: '(1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff.'") (citation omitted).

27

material fact.  The Affidavit of James Erwin filed herewith explains that loan terms requiring "skin in the game" are material representations to lenders on loans such as the Grande Palisades Loan.  (Erwin Aff., ¶¶ 7-9.)

a)    *Alternatively OSM and its predecessors concealed a material fact requiring disclosure.*

Additionally, the first element of a fraudulent inducement defense is satisfied as OSM's and its predecessors in interest **concealed** the fact that the Borrower failed to put $30 million of its own Equity into the Grande Palisades project as previously represented.  To establish the required duty to disclose, LNV must allege facts demonstrating:  (1) a fiduciary or confidential relationship; (2) a situation where one party to a transaction possesses superior knowledge not readily available to another party, and the first party knows the second party is acting on mistaken knowledge; (3) the party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth; or (4) some other set of conditions in which minimum standards of good faith and common decency require disclosure.  *Barsam v. Pure Tech Intern., Inc.*, 864 F. Supp. 1440, 1447 (S.D.N.Y. 1994) (citing cases), *vacated in aid of settlement*, 907 F. Supp. 79 (S.D.N.Y. 1995); *Yusin Brake Corp. v. Motorcar Parts of Am., Inc.*, 13 Civ. 9223 (DLC), 2014 WL 2560612, at *9 (S.D.N.Y., June 6, 2014).  Each of these situations arises in the present case.

First, New York law provides that "[b]anking practice dictates that a participating bank [such as Columbian Bank] is supposed to deal with the lead bank [(*i.e.*, OSM and its predecessors in interest)] with whom there is a contractual and fiduciary relationship, and

28

rely on [the lead bank] for information from the borrower." *Banque Arabe Int'l D'investissement v. Maryland Nat'l Bank*, 850 F. Supp. 1199, 1217 (S.D.N.Y. 1994) (emphasis added).[12] The court in *Banque Arabe* explained:

> In its capacity as servicing agent on the loan, the lead bank should keep the participating bank apprised of the status of the loan …. ***The lead bank should promptly notify the participating bank if the lead bank learns of any change in the financial condition of the borrower***.

*Id.* (quoting D. Edwin Schmelzer & Robert P Chamness, American Bankers Association, *A Banker's Guide to Loan Participation*, III-7 (1986) (emphasis added)); *see also* Erwin Aff., ¶ 11. The court in *Banque Arabe* further explained: "***the lead bank should consider information regarding the financial condition of the borrower as material to the participant***." *Id.* at 1218 (emphasis added).

Second, the facts demonstrate a situation where OSM and its predecessors in interest possessed superior knowledge not readily available to Columbian Bank and LNV, and this was known to OSM and its predecessors in interest because ***the Grande Palisades Participation Agreement expressly prohibited participants from contacting the Borrower***. (Dkt. 6-1, Grande Palisades Participation Agreement at § 2.1(l),

---

[12] Because OSM and its predecessors had a fiduciary or confidential relationship with LNV and its predecessors, an action seeking a constructive trust is appropriate notwithstanding OSM's argument to the contrary. *Sterling Natl. Bank v Israel Discount Bank of N.Y.*, 305 A.D.2d 184, 186 (N.Y. S. Ct. App. Div. 2003) (affirming lower court's determination that "triable questions of fact exist as to whether [defendant's] actions . . . violated its fiduciary obligation to defendants") ("It is no longer acceptable, if it ever was, to conclude in knowing silence, a transaction damaging to a party who is mistaken about its basic factual assumptions when . . . he would reasonably expect a disclosure"). This is particularly true where OSM and its predecessors agreed the Grande Palisades Participation Agreement "constitutes a legally binding obligation of the Lender enforceable against the Lender, except as enforceability may be limited by . . . general principles of equity[.]" (Dkt. 6-1, at § 2.2(c).)

("Participant will not contact the Obligor or any other Credit Provider . . . either via mail, telephone, fax, email or in person without the prior written consent of the Lender[.]").) Accordingly, OSM and its predecessor in interest knew Columbian Bank and LNV would be acting on mistaken knowledge.

Third, by previously representing that the terms of the Construction Loan Agreement would require $30 million in Borrower Equity provided by a related third-party, but then not informing participants that the Borrower was not able to satisfy that obligation except by using deposits from condominium purchasers, OSM and its predecessors were, in effect, providing only "half of the truth."

Fourth, minimum standards of good faith and common decency required disclosure of the change in circumstances (assuming it was not intentionally planned) when the Borrower and OSM's predecessors determined the Equity required by the Construction Loan Agreement could be paid with funds furnished by ***un-related*** third-parties. This was a material term of the loan. *See* Erwin Aff., ¶¶ 7-9, 11; *see also* Dkt. 6-1, Grande Palisades Participation Agreement, § 2.1(f) ("Participant has thoroughly reviewed the Credit Agreements and those documents contain all of the terms and conditions that the Participant considers material . . .")

2.     OSM and its predecessor(s) knew the statement was false.

The Affidavit of Ms. Borenko, for example, demonstrates that OSM's predecessors in interest (*e.g.*, Marshall) knew the representation regarding the Borrower putting $30 million of its own Equity into the Grande Palisades Project was false. *See*

30

Borenko Aff., ¶ 26 ("I and other Marshall employees, had plenty of evidence, before any funds were advanced, that Lake Austin Properties I, Ltd. and its principals had not complied with the [Grande Palisades] Loan requirements . . .").  The specific facts set forth in the affidavits of Stephen Mann and Stephen McKenzie, as well as the Malbec interrogatory responses, similarly describe a motive, intent, and purpose behind the actions of OSM and its successors in interest that legally raise a strong inference of fraudulent intent.  *C.f.  S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp.*, 84 F.3d 629, 634 (2d Cir. 1996).

> 3.   OSM's predecessors made the fraudulent statements, or concealed the material facts, with the intention of inducing reliance, and reasonable reliance was thereby induced.

The nature of participation relationships generally, and the express terms of the Grande Palisades Participation Agreements specifically, created a situation where reliance by Columbian Bank and LNV was reasonable.  *See* Erwin Aff., ¶¶ 7-11.  OSM's predecessors in interest drafted the participation agreement and, therefore, knew it constrained participants by requiring them to get information about whether the Borrower was satisfying the terms of the Grande Palisades Loan from the lead lender.  *Banque Arabe*, 850 F. Supp. 1224; Erwin Aff., ¶ 11.  The fact that OSM and its predecessors sanitized the Book used for marketing the Grande Palisades project to participants, and produced the OSM Book with material changes, demonstrates that OSM and its predecessors intended reliance and intended to defraud the participants—and then tried to cover-it-up.  This evidences OSM's conscious disregard for the truth.  Further, the court

31

in the *Banque Arabe* case aptly summarized the issue of reliance in situations like the present case by explaining:  "Especially on material matters, ***a participating bank is expected to rely on the lead bank as its source of knowledge*** and not actively seek out information from either the borrower or an outside source . . ." *Id.* (emphasis added); *see also* Erwin Aff., ¶ 9-11.

Significantly, although the Grande Palisades Participation Agreement drafted by OSM's predecessors contains an express disclaimer of reliance, (*see* Dkt. 6-1 at 6, § 2.1 (c) and (d)), "the disclaimer will not be given effect if the facts are 'peculiarly within the knowledge' of the other party." *Banque Arabe*, 850 F. Supp. at 1216, citing *Banque Arabe Int'l D'investissement v. Maryland Nat'l Bank*, 819 F. Supp. 1282, 1292 (S.D.N.Y. 1993), *aff'd*, 57 F.3d 146, 155 (2d Cir. 2001) ("As the district court noted, however, even such an express waiver or disclaimer 'will not be given effect where the facts are peculiarly within the knowledge of the party invoking it.'"); *see also OnBank & Trust Co. v. F.D.I.C.*, 967 F. Supp. 81, 86 (W.D.N.Y. 1997) (express disclaimers of reliance not given effect when facts peculiarly within the defendant's knowledge); *P.T. Bank Cent. Asia, N.Y. Branch v ABN AMRO Bank N.V.*, 301 A.D.2d 373, 377-78 (N.Y. S. Ct. App. Div. 2003) (overturning lower court's enforcement of a no reliance clause in a participation agreement and reinstating a fraudulent inducement claim); *Stambovsky v. Ackley*, 169 A.D.2d 254, 572 N.Y.S.2d 672, 677 (1991) (citing numerous cases); *c.f. Northwest Bank and Trust Co. v. First Ill. Nat'l. Bank*, 354 F.3d 721, 726 (8th Cir. 2003) (contract disclaimer on reliance in participation agreement not enforced as "fraudulent

inducement precedes the formation of the contract, and . . . to give preclusive effect to language contained therein would allow a party to bind the defrauded party to the contract through the use of a boilerplate disclaimer"). As described above, the facts at issue were peculiarly within the knowledge of OSM and its predecessors.

        4.    The fraudulent inducement and concealment of OSM and its predecessors caused damages.

The fraudulent statements, and then the fraudulent concealment, of OSM and its predecessors in interest indisputably caused damages. Facts in the record demonstrate the Borrower defaulted on the Grande Palisades Loan. OSM initiated a foreclosure sale on the property serving as collateral to the Grande Palisades Loan referred to previously in this memorandum as OSM's Florida Foreclosure Action. Ultimately, after fully funding the $140 million construction loan, OSM sold the loan for approximately $30 million to a third-party named Grande Palisades Loan Holdings, LLC on May 24, 2013. (Schoenwetter Aff., Ex. 16, Loan Purchase Agreement.) None of the participants in the Grande Palisades Loan have been made whole as $140 million was loaned to the Borrower and only $30 million was received back when this non-performing loan was sold to a third-party at a fire-sale price. Columbia Bank committed to fund $6.0 million to this loan before being shut down. The actual amount that it funded is still unknown as OSM refuses to provide an accounting. However, Columbian Bank fully funded the first 23 draw requests issued by OSM and its predecessors through August 22, 2008; accordingly, damages can be presumed. (Dkt. 63, Dougherty Aff., ¶¶15-16.)

Because LNV can demonstrate *prima facie* evidence for each of the elements

necessary to establish its defense of fraudulent inducement, partial summary judgment should be denied. LNV's defense of fraudulent inducement renders the Grande Palisades Participation Agreement voidable. Accordingly, LNV should not be relegated to its breach of contract and declaratory judgment causes of action.

D.     Violation of the Law Renders Contracts Unenforceable.

Moreover, because the Affidavit of Stephen Mann and Interrogatory response of Malbec (by way of example) contain both the facts and law necessary to show that Marshall facilitated the payment of Borrower Equity by using condominium unit down payments in violation of Florida law,[13] the Grande Palisades Participation Agreement cannot be enforced by this Court. *See Sirkin v. Fourteenth St. Store*, 124 A.D. 384, 394 (N.Y. Sup. Ct. App. Div. 1908) ("'Where the contract grows immediately out of, and is connected with, an illegal or immoral act, a court of justice will not lend its aid to enforce it. And if the contract be, in part only connected with the illegal transaction, and growing immediately out of it, though it be, in fact, a new contract, it is equally tainted by it.'") quoting *Armstrong v. Toler*, 24 U. S. 258, 261 (1826); *McConnell v. Commonwealth Pictures Corp.*, 7 N.Y.2d 465, 471 (N.Y. Ct. App. 1960) ("Consistent with public morality and settled public policy, we hold that a party will be denied recovery even on a contract valid on its face, if it appears that he has resorted to gravely immoral and illegal conduct in accomplishing its performance.")

---

[13] *See* Schoenwetter Aff., Ex. 5, Mann Aff., ¶ 6, Ex. B at 1-3; Schoenwetter Aff., Ex. 7, Malbec Interrogatory Response No. 3, at 2-9.

**IV.  Regardless of whether LNV asserts a fraudulent inducement defense, case law holds, and the Federal Rules of Civil Procedure provide, that LNV may plead in the alternative.**

Courts applying New York and Minnesota law hold that parties in LNV's position may plead in the alternative and pursue both contract-based claims and non-contract claims.  The issue is largely controlled by Rule 8, which expressly provides that "[a] party may set out 2 or more statements of a claim . . . alternatively . . . either in a single count . . . or in separate ones."  Fed. R. Civ. P. 8(d)(2); *see also* Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice.").

An election of remedies is not yet required.  If it appears ***during the trial*** that an election of remedies must be made, it is within the Court's power to compel an election at that time.  *Prudential Oil Corp. v. Phillips Petrol. Co*, 418 F. Supp. 254, 258 (S.D.N.Y. 1975).  However, the "doctrine of election of remedies 'represents a harsh and arbitrary principle' and 'should be applied only where there has clearly been an irrevocable election.'"  *Id.* at 257 (citations omitted).  Courts apply a "liberal" election of remedies doctrine rather than a "narrow and harsh one."  *Id.*  For example, in the District of Minnesota, courts have held that "use of the doctrine . . . to prevent . . . pleading inconsistent or alternative theories of relief . . . has been eviscerated by the permissive rules of pleading under Fed. R. Civ. P. 8[.]"  *In re Grain Land Coop*, 978 F. Supp. 1267, 1278 (D. Minn. 1997) (quoting *Kansas State Bank in Holton v. Citizens Bank of Windsor*, 737 F.2d 1490, 1499 (8th Cir. 1984)).  Accordingly, this Court should not dismiss claims asserted by LNV that may be in the alternative to LNV's breach of contract and

35

declaratory judgment causes of action.

In *Bridgeway Corp. v. Citibank, N.A.*, the court relied on Rule 8 in denying defendant's motion to dismiss. 132 F. Supp. 2d 297, 305 (S.D.N.Y 2001). Despite dismissing the plaintiff's fraud claim, the court determined plaintiff's quasi-contractual claim for unjust enrichment should not be dismissed because "***there is a dispute as to defendant's obligations under the contract*** . . . ." *Id.* (emphasis added). Accordingly, the court explained dismissal of plaintiff's alternative theories at this stage would violate the "liberal policy" of Rule 8 which allows plaintiffs "wide latitude in framing their right to recover." *Id.* (quoting *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 754 F. Supp. 37, 40 (S.D.N.Y. 1991) (denying motion to dismiss quantum meruit and unjust enrichment claims and rejecting the theory that "the existence of an express contract governing a particular subject matter bars recovery under theories of quantum meruit (implied contract) or unjust enrichment (quasi-contract) for events arising out of the same subject matter")); *see also Singer v. Xipto Inc.*, 852 F. Supp. 2d 416, 426 (S.D.N.Y. 2012) ("While a party generally may not simultaneously recover upon a breach of contract and unjust enrichment claim arising from the same facts, it is still permissible to plead such claims as alternative theories."); *U.S. Bank N.A. v. Educ. Loans Inc.*, Civ. No. 11-1445 (RHK/JJG), 2011 WL 5520437, at *5 (D. Minn. Nov. 14, 2011) (holding "alternative pleading is permissible" and refusing to dismiss claims for unjust enrichment and quantum meruit).

As noted by this Court in its March 4th Order, "this dispute is not ripe for

adjudication." (Dkt. 71 at 6.) As explained in the Order, the parties dispute "how, if at all, Columbian Bank's obligations to Pay Advances and Extraordinary Expenses under the [Grande Palisades] Participation Agreement prior to 9/30/2009 would have been effected by the other participants' funding of the shortfall that arose during the receivership—and, for that matter, how it may have been affected by the borrower's default." *Id.* at 6-7.

Adding the parties' dispute regarding the Bahia Participation Agreement does not clarify matters. First, the parties disagree whether BF-Negev possesses the right under the Bahia Participation Agreement to withhold payments due and owing to LNV. Second, because BF-Negev claims to be setting off money that should be paid to LNV based on LNV allegedly failing to make payments owed under the Grande Palisades Participation Agreement to OSM (Dkt. No. 1 at Exs. 1 and 2), this necessarily leads back to the dispute over what the obligations of LNV and OSM are in light of the Funding Agreement. With respect to that dispute, this Court clearly stated "that this dispute is not ripe for adjudication" (Dkt. 71 at 6) and suggested that the subject matter jurisdictional issues involved in that motion may be "so bound up with the merits that a full trial on the merits may be necessary to resolve the issue." (Dkt. 71 at 3, citation omitted.)

Because these disputes materially affect the contract-based claims pursued by LNV, *there is a dispute as to defendant's obligations under the contract*, and dismissal of LNV's alternative theories at this stage would violate the liberal policy of Rule 8 allowing pleading in the alternative. *See, e.g., Bridgeway Corp.*, 132 F. Supp. 2d at 305;

37

*Lefkowitz*, 2014 WL 925410, at *12.  Moreover, OSM's arguments in favor of partial summary judgment ignore the obvious reasons for claimants pleading alternative claims in addition to a breach of contract claim:  "the claimant may not prevail on the breach-of-contract claim."  *Columbia Cas. Co. v. 3M Co.*, 814 N.W.2d 33, 38 (Minn. Ct. App. 2012).

Finally, OSM's argument belies its own pleading practice.  OSM asserted a claim for unjust enrichment in its counterclaims in addition to claims for breach of contract and declaratory judgment.  (Dkt. 6.)  OSM then argued against dismissal of the unjust enrichment claims in opposition to LNV's motion to dismiss, explaining just as LNV does that it is entitled to plead equitable claims in the alternative to legal claims based on Rule 8 of the Federal Rules of Civil Procedure.  (Dkt. 14 at 39-40, citing numerous cases.)  OSM's decision not to voluntarily dismiss its own non-contract claim convincingly demonstrates that OSM possesses little faith in its own argument.  Accordingly, this Court should deny OSM's and BF-Negev's pending motion for partial summary judgment.

## **CONCLUSION**

LNV respectfully requests that the pending motion for partial summary judgment be denied based upon the reasons set forth in the foregoing memorandum.

Respectfully submitted,

Dated: July 29, 2014                    **BOWMAN AND BROOKE LLP**

By:    /s/ Charles J. Schoenwetter
Charles (CJ) Schoenwetter (#025115X)
cj.schoenwetter@bowmanandbrooke.com
Richard G. Morgan (#157053)
Richard.morgan@bowmanandbrooke.com
150 South Fifth Street, Suite 3000
Minneapolis, MN  55402
Telephone: (612) 339-8682
Fax: (612) 672-3200

and

Thomas P. Branigan (P41774)
tom.branigan@bowmanandbrooke.com
41000 Woodward Ave., Suite 200 East
Bloomfield Hills, MI 48304
Telephone: (248) 205-3300
Fax: (248) 205-3399

*ATTORNEYS FOR LNV CORPORATION*

9082113

39