UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

LNV Corporation,

        Plaintiff,

                                        No. 13-cv-1926 (JNE/LIB)

v.                                           ORDER

Outsource Service Management, LLC
d/b/a Presidium Asset Solutions and
BF-Negev, LLC,

        Defendants.

This case is before the Court on a Motion for Partial Summary Judgment brought jointly by the Defendants, Outsource Service Management ("OSM") and BF-Negev. ECF No. 88. For the reasons discussed below, the motion is granted.[1]

## Background

This case arises out of a dispute over the parties' respective rights and obligations stemming from two loans.

The first, known as the Grande Palisades loan, was made to a developer to build a resort hotel and condominium complex near Disney World in Orlando, Florida. To fund the loan, the lead lender, Marshall Financial Group, entered into a number of participation agreements with other financial institutions, including one in 2007 with Columbian Bank of Kansas. Columbian Bank subsequently failed and entered receivership. In 2009, the Federal Deposit Insurance

---

[1] OSM and BF-Negev included a request for a protective order under Federal Rule of Civil Procedure 26(c) in their reply memorandum. The matter of a protective order is not properly before the Court. *See* D.Minn. L.R. 7.1(b) ("Unless the court orders otherwise, all nondispositive motions must be heard by the magistrate judge.").

Corporation acting as receiver sold of a pool of loans owned by Columbian Bank, including its participation in the Grande Palisades loan, to Plaintiff LNV Corporation.  At roughly the same time, OSM succeeded Marshall as the lead lender.

The second loan giving rise to the disputes here, known as the Bahia loan, was made for the re-financing and construction of the Little Harbor Development near Tampa, Florida.  As with the Grande Palisades loan, the lead lender of the Bahia loan, BankFirst, entered into a number of participation agreements, including one in 2007 with First Priority Bank.  Since then, through a series of assignments that are not relevant to this motion, LNV has succeeded First Priority Bank as participant, BF-Negev has succeeded BankFirst as lead lender, and OSM has become the loan's servicer.

In its Complaint, LNV pleads twelve causes of action against OSM and BF-Negev over the disputes that have arisen in connection with these two loans.  In addition to breach of contract claims based on the written agreements associated with the loans, LNV also asserts civil theft/conversion, unjust enrichment/quantum meruit, and constructive trust claims against the Defendants.  In turn, in an Answer filed jointly by the Defendants, OSM asserts breach of contract and unjust enrichment counterclaims against LNV relating to the Grande Palisades dispute.[2]

### Discussion

With their Motion for Partial Summary Judgment, OSM and BF-Negev argue that the record now establishes that the parties' disputes over the Grande Palisades and Bahia loans are

---

[2]     LNV and OSM also each seek a declaratory judgment regarding the impact of the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA") on the claims arising out of the Grande Palisades loan.  These FIRREA issues are not relevant to this motion.

governed by valid and enforceable contracts.  Therefore, they argue, it is appropriate for the Court to streamline the case – and particularly what remains of discovery – by dismissing LNV's non-contract claims.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute . . . ." *Id.* (c)(1)(A)–(B).  The Court "need consider only the cited materials, but it may consider other materials in the record" not specifically called to its attention by the parties' memoranda. *Id.* (c)(3).  In determining whether summary judgment is warranted, this "evidence and all fair inferences from it must be viewed in the light most favorable to the non moving party . . . ." *Johnson v. Blaukat*, 453 F.3d 1108, 1112 (8th Cir. 2006).

LNV opposes the Defendants' motion, arguing that the record contains sufficient evidence to create a genuine issue of material fact – or could, with more discovery pursuant to Federal Rule of Civil Procedure 56(d) – regarding the validity of the Grande Palisades Loan Participation Agreement between Marshall and Columbian Bank, to which OSM and LNV succeeded.[3]

---

[3]     LNV also opposes the motion generally on the ground that Federal Rule of Civil Procedure 8 authorizes it to plead its claims in the alternative, regardless of their consistency. That may be true, but as the Court previously noted in ruling on LNV's Motion to Dismiss, a non-contract claim may move forward alongside a contract claim only "until the contract is deemed to be valid and to govern the dispute."  Order of March 4, 2014 at 9, ECF No. 71 (quoting *U.S. Bank Nat. Ass'n v. Education Loans Inc.*, Civ. No. 11-1145 (RHK/JJG), 2011 WL 5520437 (D.Minn. Nov. 14, 2011)).  Rule 8's allowance for alternative pleading poses no bar to a grant of partial summary judgment here.

That issue, as well as the state of the parties' dispute over the Bahia loan, are discussed below.

## I.      Grande Palisades dispute.

Fundamentally, with respect to the Grande Palisades portion of the case, LNV is suing OSM for disbursement of a percentage of the Collections received on the Grande Palisades loan that LNV alleges it is owed as a participant.  In turn, OSM is countersuing LNV for certain Credit Advances and Extraordinary Expenses that OSM alleges LNV is obligated to pay as a participant.

In its Answer, LNV asserted the following as an affirmative defense to OSM's counterclaims:

> Based upon the September 23, 2013 Affidavit of Cecelia Borenko in *Outsource Services Management, LLC v. Lake Austin Properties Limited I, LTD*, Case No. 8:13-CV-1476-T-35AEP (M.D. Fla. Sept. 23, 2013), filed in connection with Malbec Investments, LLC's Renewed Motion to Intervene, OSM's claims are barred by fraud, misrepresentation, fraudulent inducement and/or fraudulent concealment.

Construed in the light most favorable to LNV – in fact, in LNV's own telling – Borenko's affidavit in combination with other materials in the record demonstrates the following: Marshall originated the $140 million Grande Palisades construction loan.  One of the terms of that loan required the borrower to fund a portion of the cost of the project with approximately $30 million of its own equity.  This is known as the borrower having "skin in the game"; without it, lenders, as well as participating banks, would typically be unwilling to fund a project of that magnitude.  According to LNV, Marshall knew from the outset that the borrower was not in compliance with this term, but nevertheless moved forward with the loan because it stood to benefit financially from it.  In order to retain those benefits while minimizing its own

4

exposure to the risk inherent in such a "no money down" unfunded loan, Marshall proceeded to market participations in the loan to other financial institutions using materials that specifically stated that the borrower had the required $30 million worth of "skin in the game" furnished by "related third parties."  Ultimately, more than sixty banks, including Columbian Bank, entered into participations.  The borrower subsequently defaulted.

LNV argues that this evidence creates a genuine issue of material fact as to whether Marshall secured Columbian Bank's participation in the Grande Palisades loan by fraud.  In this regard, LNV seeks to establish its right to disaffirm the Grande Palisades Participation Agreement by way of its noticed affirmative defense of fraudulent inducement and/or fraudulent concealment.

The parties agree that the Grande Palisades Participation Agreement is governed by New York law.  Under New York law, to sustain its fraud defense, LNV bears the burden of establishing by clear and convincing evidence: (1) that Marshall either misrepresented a material fact to Columbian Bank, or, alternatively, concealed a material fact from Columbian Bank that it had a duty to disclose; (2) that Columbian Bank entered into the Participation Agreement in justifiable reliance on Marshall's misrepresentation or concealment; and (3) that Columbian Bank was injured thereby.[4]  *Lama Holding Co. v. Smith Barney Inc*., 668 N.E.2d 1370, 1373 (N.Y. 1996); *Vermeer Owners, Inc. v. Guterman*, 585 N.E.2d 377, 378 (N.Y. 1991); *Lane v.*

---

[4]     According to some authorities, the intent to deceive is also an element of fraudulent inducement. *E.g., Channel Master Corp. v. Aluminum Limited Sales, Inc.*, 151 N.E.2d 833, 835 (N.Y. 1958).  But others find that "New York law . . . is well settled that an innocent misrepresentation of a material fact permits rescission even though made without an intent to deceive." *Stern v. Satra Corp.*, 539 F.2d 1305, 1308 (2nd Cir. 1976).  *See also Banque Arabe*, 57 F.3d at 153-54 (discussing differences between fraudulent inducement, fraudulent concealment, and innocent misrepresentation).
        In any event, the presence or absence of scienter is not determinative of the outcome of the Defendants' motion.

*McCallion*, 561 N.Y.S.2d 273, 275 (N.Y. App. Div. 1990).  *See also Stuart v. Lester*, 17 N.Y.St.

Rep. 248 (N.Y. Gen. Term 1888) (where defendant resists enforcement of a contract induced by

fraud, it is "not . . . necessary for the defendant to show, in order to defeat a recovery, that he had

suffered a pecuniary loss in any particular sum by reason of the misrepresentation made by the

plaintiff").

OSM argues that LNV's fraud defense fails in the face of the plain language of both the

Grande Palisades Participation Agreement between Marshall and Columbian Bank and the Loan

Sale Agreement by which the FDIC-Receiver conveyed Columbian Bank's interest in the

participation to LNV.  These two issues are discussed in turn below.


### A.  Disclaimer.

OSM first contends that LNV is foreclosed from proving reliance, an essential element of

a fraudulent inducement defense, by the disclaimer that appears in § 2.1 of the Grande Palisades

Participation Agreement.  The relevant language is as follows:

> c. [Columbian Bank] has, without reliance of any kind or nature on [Marshall],
> any other Credit Provider or the directors, officers, agents, employees or attorneys
> of [Marshall], and instead in reliance upon information supplied to it by or on
> behalf of the Obligor and upon such other information as [Columbian Bank]  has
> deemed appropriate, made its own independent credit analysis and decision to
> purchase its Participation Interest in the Credit;

> d. [Columbian Bank] will, independently and without reliance of any kind or
> nature on [Marshall], any other Credit Provider or the directors, officers, agents,
> employees or attorneys of the Lender, continue to make its own independent
> credit analysis and decisions in acting or not acting under this Agreement and the
> Credit Agreements[.]

Under New York law, general merger clauses and specific disclaimers are given different

effects.  A general merger clause – such as an "omnibus statement that the written instrument

embodies the whole agreement, or that no representations have been made" – "is ineffective to

6

exclude parol evidence to show fraud in inducing the contract[.]" *Danann Realty Corp. v. Harris*, 157 N.E.2d 596 , 601 (N.Y. 1959).  However, "[w]here a party specifically disclaims reliance upon a representation in a contract, that party cannot, in a subsequent action for fraud, assert it was fraudulently induced to enter into the contract by the very representation it has disclaimed." *Banque Arabe et Internationale D'Investissement v. Maryland Nat. Bank*, 57 F.3d 146, 155 (2nd Cir. 1995) (quotation and citation omitted).  "The presence of such a disclaimer clause is inconsistent with the contention that [the party] relied upon the misrepresentation, and was led thereby to make the contract." *Danann*, 157 N.E.2d at 599 (quotation and citation omitted).

The reliance provisions in the Grande Palisades Participation Agreement constitute a specific disclaimer.  LNV's defense rests on its contention that Columbian Bank entered into the Grande Palisades Participation Agreement in justifiable reliance on Marshall's misrepresentation or concealment regarding the borrower's "skin in the game," which is material, by LNV's own articulation of the alleged fraud, because of the indication it provides of the borrower's creditworthiness.  But Columbian Bank expressly represented in the contract that it had "made its own independent credit analysis and decision to purchase its Participation Interest in the Credit" "without reliance of any kind or nature on [Marshall.]"  By itself, this would tend to defeat LNV's fraud defense.  *See Banque Arabe*, 57 F.3d at 155 (noting that, under New York law, "disclosure obligations may be modified by contract" and concluding that similarly-worded participation agreement "operate[d] as a waiver absolving [the lead lender] of responsibility to make affirmative disclosures concerning the financial risks" of the loan).

However, even such a specific disclaimer will not be given effect in certain circumstances.  To overcome the disclaimer in the Grande Palisades Participation Agreement,

7

LNV must show that the misrepresented or concealed fact at issue – that the borrower did not

have the "skin in the game" required by the terms of the loan – was "peculiarly within the

knowledge" of Marshall, and that Marshall knew that Columbian Bank was "acting in reliance

on mistaken knowledge regarding that issue" when it entered into the participation.  *Id.  See also*

*Boyle v. McGlynn*, 814 N.Y.S.2d 312, 313-14 (N.Y. App. Dept. 2006) (knowledge of the party

alleged to have committed fraud, as well as availability of the information to the allegedly

defrauded party, are questions of fact).  On these points, LNV has made a sufficient showing that

would, all else being equal, allow it to move forward with its defense.

OSM argues that the "superior knowledge" doctrine does not apply in circumstances like

these involving a transaction between sophisticated financial institutions, as such parties can be

expected to demand disclosure, and express inclusion in the contract, of any material facts on

which they purport to rely.  *See, e.g., Rodas v. Manitaras*, 552 N.Y.S.2d 618 (N.Y. App. Dept.

1990) (concluding that where "a party has been put on notice of the existence of material facts

which have not been documented and he nevertheless proceeds with a transaction without

securing the available documentation or inserting appropriate language in the agreement for his

protection, he may truly be said to have willingly assumed the business risk that the facts may

not be as represented").

However, the Grande Palisades Participation Agreement does state, at § 2.1(f), that

"[Columbian Bank] has thoroughly reviewed the Credit Agreements and those documents

contain all of the terms and conditions that [Columbian Bank] considers to be material to the

Credit and upon which [Columbian Bank] has relied in purchasing its interest in the Credit[.]"

As the "Credit Agreements" are the documents evincing the loan that Marshall made to the

borrower, the Participation Agreement can be read to incorporate as a material term of

Columbian Bank's participation the requirement that the borrower have "skin in the game."

By the same token, the Participation Agreement at § 2.1(b) also attests that

[Columbian Bank] has been granted access to, and received all of, the information
it has requested or believed to be necessary to enable it to make an independent
and informed judgment with respect to the creditworthiness of the Obligor
including information provided to [Columbian Bank] by [Marshall.]

The critical question, then, is whether, with this access, Columbian Bank could have discovered

through an exercise of due diligence what Marshall is alleged to have known about the

borrower's lack of "skin in the game."  *See Royal American Managers, Inc. v. IRC Holding*

*Corp.*, 885 F.2d 1011, 1016 (2nd Cir. 1989) ("Where the representation relates to matters that are

not peculiarly within the other party's knowledge and both parties have available the means of

ascertaining the truth, New York courts have held that the complaining party should have

discovered the facts and that any reliance under such circumstances therefore would be

unjustifiable."); *Danann*, 157 N.E.2d at 601 ("[I]f the facts represented are not matters peculiarly

within the party's knowledge, and the other party has the means available to him of knowing, by

the exercise of ordinary intelligence, the truth or the real quality of the subject of the

representation, he must make use of those means, or he will not be heard to complain that he was

induced to enter into the transaction by misrepresentations.") (quotation omitted).

On this question of fact, the particulars of the Borenko affidavit on which LNV bases its

fraud defense are noteworthy.  Borenko worked as an Assistant Vice President and Financial

Analyst for Marshall in its Orlando, Florida office from 2004 through 2008.  In that capacity,

Borenko was involved in administering the Grande Palisades loan, including performing "all

actions related to the financial analysis of the loan," "assisting with loan documentation," and

"gathering the materials in preparing the marketing materials sent out by Marshall to prospective

participants in the Loan[.]"  According to her affidavit, in early 2007, Borenko made efforts to obtain documentation from the "related third parties" who were purported to have put up the required $30 million worth of "skin in the game" for the Grande Palisades loan by way of a subordinated loan to the borrower.  However, Borenko states that she "was never able to get a satisfactory response" from the guarantors to her attempts to "substantiate that the subordinated debt was legitimate."  Ultimately, based in some significant degree on the knowledge she had gained from her prior dealings with the guarantors – rather than solely on the contents of the documents she was able to review – Borenko concluded that the guarantors "did not have that kind of liquidity" and that the money actually "had to have come from buyers' deposits" on two other condominium projects.  Consequently, Borenko suspected that the borrower was not in compliance with the terms of the Grande Palisades loan, and in April of 2008 she shared her concerns with others at Marshall.

This record evidence is sufficient to create a genuine issue of material fact as to whether Columbian Bank could have ascertained the truth regarding the borrower's alleged lack of "skin in the game" through an exercise of due diligence before entering into the Participation Agreement in April of 2007.  Furthermore, the discovery that LNV details in its Rule 56(d) affidavit – including the production of documents relating to the subordinated loan and the depositions of individuals who were in the employ of Columbian Bank and Marshall at the relevant time periods – could be expected to provide more insight into the issue.

For these reasons, the specific disclaimer of reliance in the Grande Palisades Participation Agreement would not, by itself, preclude LNV from proceeding with its fraud defense.

### B.  Rescission.

However, there are additional considerations.  OSM argues that LNV's assertion of fraud is in reality an "affirmative claim for rescission" of the Grande Palisades Participation Agreement sounding in tort, rather than the affirmative defense that LNV has labeled it, and requests that the Court treat it as such.  *See* Fed. R. Civ. P. 8(c)(2) ("If a party mistakenly designates . . . a counterclaim as a defense, the court must, if justice requires, treat the pleading as though it were correctly designated, and may impose terms for doing so.").

OSM contends that this move would be determinative in two ways, both of which are considered below.

### 1.  Tort v. contract.

First, OSM points out that "[u]nder New York law, the assignment of the right to assert contract claims does not automatically entail the right to assert tort claims arising from that contract."  *Banque Arabe*, 57 F.3d at 151.  Here, when Columbian Bank failed, all of its "rights, titles, powers, and privileges" passed to the FDIC as receiver.  12 U.S.C. § 1821(d)(2).  The FDIC-Receiver later sold Columbian Bank's participation in the Grande Palisades loan to LNV.  According to LNV, the Loan Sale Agreement by which that assignment was made contains no language evincing an intent by the FDIC-Receiver to transfer its right to assert tort claims arising from the Grande Palisades Participation Agreement to LNV.

However, even were that true, it would not bar LNV from asserting its fraudulent inducement defense here.  Simply put, that defense is not a tort claim.

There is a qualitative distinction between a cause of action in tort for fraudulent inducement and fraudulent inducement as an affirmative defense to contract liability. *See, e.g.,*

*United States Fid. & Guar. Co. v. Delmar Dev. Partners*, *LLC*, 22 A.D.3d 1017, 1019-20 (N.Y. App. Div. 2005) (where defendant sought to amend its answer "to add fraud in the inducement as an affirmative defense[,] the proposed claim of fraud is offered only to counter the contractual rights asserted" by the plaintiff and therefore "no danger exists that the proposed amendment [would] effectively change[] the original action from one sounding in breach of contract to an action alleging tortious conduct").  With regard to the latter, New York courts have long held – as a matter of contract law – that a fraudulently induced contract is a "voidable transaction," as the misrepresentation or concealment of a fact material to the agreement precludes the meeting of the minds that is essential to the formation of a valid and binding contract.  *E.g., Schenck v. State Line Telephone Co.*, 144 N.E. 592, 593 (N.Y. 1924).  In consequence, a fraudulently induced contract may be affirmed or disaffirmed at the choice of the defrauded party.  *Id.*

If the defrauded party desires the benefit of the bargain it was fraudulently induced to accept, it will ratify the contract and press a claim for damages or specific performance.  In the same action, the defrauded party may also pursue a separate claim in tort seeking compensation for any loss that may have been caused by the fraudulent inducement itself.[5]  *See, e.g., Deerfield Communications Corp. v. Chesebrough-Ponds, Inc.*, 502 N.E.2d 1003, 1004 (N.Y. 1986) (rejecting contention that separate awards in same action for breach of contract and for the tort of fraudulent inducement were duplicative and clarifying that "measure of damages recoverable for

---

[5]     New York adheres to the "general rule [that] to recover damages for tort in a contract matter, it is necessary that the plaintiff plead and prove a breach of duty distinct from, or in addition to, the breach of contract." *Non-Linear Trading Co., Inc. v. Braddis Associates, Inc.*, 675 N.Y.S.2d 5, 13 (N.Y. App. Dept. 1998).  Where a plaintiff was fraudulently induced to enter into the contract, the defendant's misrepresentation of material facts is "collateral to the contract . . . and therefore involves a separate breach of duty." *Gosmile, Inc. v. Levine*, 915 N.Y.S.2d 521, 524 (N.Y. App. Dept. 2010).

being fraudulently induced to enter into a contract which otherwise would not have been made is indemnity for the loss suffered through that inducement") (quotation and punctuation omitted).

On the other hand, if the defrauded party desires to return to the position it occupied before it entered into the fraudulently induced contract, it will disaffirm the contract and press a claim for rescission "upon the theory that [the] contract is to be treated as nonexistent for lack of true assent." *Richard v. Credit Suisse*, 152 N.E. 110, 111 (N.Y. 1926). With such a claim, the defrauded party may pursue such "off contract" or "quasi-contract" theories of recovery as unjust enrichment and quantum meruit, which are, in some contexts, referred to generally as "restitution" measures. *F.T.C. v. Bronson Partners, LLC*, 654 F.3d 359, 370 (2nd Cir. 2011) (explaining that "restitution" was conceived of "as a unifying theory of private-law liability akin to tort or contract – a descriptor of a class of wrongs rather than any particular remedy" and that "courts and commentators often use the term 'restitution' as a metonym for the class of remedies particularly identified with that head of liability"). *See also Judge Rotenberg Educational Center Inc. v. Blass*, 882 F.Supp.2d 371, 376-77 (E.D.N.Y. 2012) (noting that "quantum meruit, unjust enrichment, and restitution claims are not separate causes of action under New York law, but are instead conceptualized as different facets of a single quasi contract cause of action") (internal quotation, punctuation, and citation omitted).

Also, as with concurrent causes of action for breach of contract and for the tort of fraudulent inducement, the defrauded party seeking rescission and restitution may simultaneously press a separate claim in tort. New York law provides that

> [a] claim for damages sustained as a result of fraud or misrepresentation in the inducement of a contract or other transaction, shall not be deemed inconsistent with a claim for rescission or based upon rescission. In an action for rescission or based upon rescission the aggrieved party shall be allowed to obtain complete relief in one action, including rescission, restitution of the benefits, if any, conferred by him as a result of the transaction, and damages to which he is

13

entitled because of such fraud or misrepresentation; but such complete relief shall
not include duplication of items of recovery.

N.Y. C.P.L.R. § 3002(e).

With all of these factors considered, then, it is clear that LNV does not assert a fraudulent

inducement claim in tort. Instead, LNV has asserted fraudulent inducement as an affirmative

defense to liability on the Grande Palisades Participation Agreement. That LNV would, if

successful on the merits, earn the right to avoid liability on that contract by disaffirming it does

not transform the defense into a claim in tort.


### 2.   Defense v. claim.

Nevertheless, OSM also contends that LNV is foreclosed from pursuing its fraud defense

by the terms of the Loan Sale Agreement through which LNV acquired Columbian Bank's

participation in the Grande Palisades loan from the FDIC-Receiver. Regardless of whether

LNV's assertion of fraud sounds in tort, in § 2.7 of the Loan Sale Agreement, the FDIC-Receiver

expressly withheld from LNV "all right, title, and interest . . . in and to . . . any and all claims of

any nature whatsoever that might now exist or hereafter arise, whether known or unknown, that

[the FDIC-Receiver] has or might have . . . against any third parties involved in any alleged fraud

or other misconduct relating to the making or servicing of a Loan[.]" The Court agrees with

OSM that LNV has asserted such a claim here.[6]

---

[6]      OSM necessarily contends that it "stands in the shoes" of Marshall as the "third part[y]"
to the Loan Sale Agreement that is alleged to have been "involved in . . . fraud or other
misconduct relating to the making" of the Grande Palisades Participation Agreement. *See
Richard T. Blake & Associates, Inc. v. Aetna Cas. & Sur. Co.*, 681 N.Y.S.2d 73, 75 (N.Y. App.
Dept. 1998) ("It is well established that an assignee stands in the shoes of the assignor and takes
the assignment subject to any pre-existing liabilities."). *Cf. Lapis Enterprises, Inc. v.
International Blimpie Corp.*, 445 N.Y.S.2d 574 (N.Y. App. Dept. 1981) ("[A]lthough the bank is
not alleged to have itself perpetrated the fraud, it is well settled that an assignee of a mortgage

With its Complaint, LNV brings both breach of contract and quasi contract claims against OSM arising out of the dispute over its participation interest in the Grande Palisades loan.  Under New York law, LNV may recover in quasi contract only if the Grande Palisades Participation Agreement is voidable or if it does not cover the subject matter of this dispute.  *Clark-Fitzpatrick*, 516 N.E.2d at 193 ("A 'quasi contract' only applies in the absence of an express agreement . . . .").  *See also, e.g., Joseph Sternberg, Inc. v. Walber 36th Street Associates*, 594 N.Y.S.2d 144, 146 (N.Y. App. Dept. 1993) ("[W]here there is a bona fide dispute as to the existence of a contract or where the contract does not cover the dispute in issue, plaintiff may proceed upon a theory of quantum meruit and will not be required to elect his or her remedies.").

LNV does not deny that the Grande Palisades Participation Agreement covers the subject matter of the parties' dispute over the Grande Palisades loan.[7]  But of course it does argue via its fraudulent inducement defense that that contract is voidable.  It is thus clear that LNV's assertion that the Grande Palisades Participation Agreement was fraudulently induced is part and parcel of its quasi contract claims.  *Cf. Mid-Atlantic Perfusion Associates, Inc. v. Westchester County Health Care Corp.*, 864 N.Y.S. 2d 100, 102 (N.Y. App. Dept. 2008) (finding fraudulent inducement claim to be "duplicative of the quasi-contract causes of action").

In this case, LNV is not asserting fraudulent inducement simply to defeat OSM's breach of contract claim, as would be true of a pure affirmative defense.  *See Saks v. Franklin Covey*

---

takes it subject to the equities attending the original transaction [and therefore] subject to the mortgagor's action for fraud.") (internal citations omitted).  LNV does not contest this point.

[7]     As noted above, LNV is suing OSM for disbursement of the Collections on the Grande Palisades loan that LNV alleges it is owed, while OSM is suing LNV for certain Credit Advances and Extraordinary Expenses that OSM alleges LNV is obligated to pay.  The rights and obligations of the lead lender and the participant with respect to Collections, Credit Advances, and Extraordinary Expenses are addressed in § 3 of the Grande Palisades Participation Agreement and elsewhere.

*Co.,* 316 F.3d 337, 350 (2d Cir.2003) ("An affirmative defense is defined as a defendant's assertion raising new facts and arguments that, if true, will defeat the plaintiff's . . . claim, even if all allegations in the [plaintiff's] complaint are true."). Rather, LNV is explicitly asserting a right to disaffirm the Grande Palisades Participation Agreement, premised upon the material misrepresentations or omissions that are alleged to have occurred during the formation of that contract, as a predicate to recovering on the quasi contract theories that it pleads in its Complaint. *E.g.*, LNV's Memorandum in Opposition at 25-26, ECF No. 96 ("[D]ue to the fraudulent inducement[,] LNV may avoid (i.e., rescind) the Grande Palisades Participation Agreement at its pleasure. . . . Thus, LNV is not relegated to pleading only breach of contract and declaratory judgment claims, and may assert its other claims as well."). Under New York law, that is the assertion of a cause of action for rescission. *E.g., Channel Master*, 151 N.E.2d at 835 (discussing elements of cause of action "based on fraudulent representations, whether it be for the rescission of a contract or . . . in tort"); *Urquhart v. Philbor Motors, Inc.*, 780 N.Y.S.2d 176, 177 (N.Y. App. Dept. 2004) (discussing cause of action "for rescission of a contract . . . on the ground of fraud").

Regardless of the headings and organization of its pleadings, LNV's assertion of the right of rescission in conjunction with an entitlement to quasi contract relief amounts to a "claim," by any definition of that term. *See, e.g.,* Black's Law Dictionary (9th ed. 2009) (defining "claim" as, inter alia, "[t]he aggregate of operative facts giving rise to a right enforceable by a court," "[t]he assertion of an existing right; any right to payment or to an equitable remedy, even if contingent or provisional," and "[a] demand for money, property, or a legal remedy to which one asserts a right"); American Heritage Dictionary (5th ed. 2014) (defining "claim" as, inter alia,

16

"[a] demand for something as rightful or due," "[a] basis for demanding something; a title or right," and "[a] demand for payment in accordance with [a] formal arrangement").

The broad language of § 2.7 of the Loan Sale Agreement unambiguously indicates that LNV was not to obtain the right to seek affirmative relief for itself arising out of "any alleged fraud or other misconduct" in the making of the Grande Palisades Participation Agreement. *See, e.g., Franklin Apartment Associates, Inc. v. Westbrook Tenants Corp.*, 841 N.Y.S.2d 673, 674 (N.Y. App. Dept. 2007) ("When the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving practical interpretation to the language employed and the parties' reasonable expectations. . . . The construction and interpretation of an unambiguous written contract is an issue of law within the province of the court.") (internal citations omitted). Whether that relief takes the form of damages in a tort action or restitution of the benefits conferred under the contract in an action for rescission, the FDIC-Receiver retained the right to pursue and extract that measure and restore it to the Columbian Bank receivership. *Cf.* 12 U.S.C. § 1821(d)(14)(C) (providing for FDIC-Receiver to bring "claim arising from fraud, intentional misconduct resulting in unjust enrichment, or intentional misconduct resulting in substantial loss" on behalf of the failed institution even where state statute of limitations has expired). LNV is thus foreclosed from pursuing its fraudulent inducement defense here.[8]

---

[8]      OSM additionally argues that, even if LNV is not barred from asserting its defense by the Loan Sale Agreement, that defense should go no further because the "remedy" LNV seeks for the alleged fraudulent inducement of the Grande Palisades Participation Agreement – its rescission – would be "unworkable."  OSM's argument is grounded in the evident difficulty of "unwinding" that contract with respect to all of the various entities that have been a party to it.  As OSM puts it in its reply memorandum,

> LNV and OSM are assignees of their interests and have never paid any consideration to the other.  LNV purchased the Participation directly from the

### C. Non-contract claims.

With the fraudulent inducement defense thus unavailable, LNV presses one other ground on which to invalidate the Grande Palisades Participation Agreement.  According to LNV, its evidence could demonstrate that Marshall violated Florida law in facilitating payment of the borrower's "skin in the game," thereby rendering the Grande Palisades Participation Agreement unenforceable under the doctrine of illegality.

This is unpersuasive.  The focus of the illegality doctrine is the performance that is required or contemplated by the contract: "Under New York law, an illegal contract *malum in se* is unenforceable and will be voided," while "[a] contract that is illegal because performance is

---

FDIC-R, not Marshall or OSM.  LNV is certainly not claiming any fraud on the part of the FDIC-R.  Similarly, Columbian and Marshall and Marshall's servicing affiliate, BankFirst, are all failed banks.  For a time, the FDIC acted as receiver for each of these failed banks.  LNV is certainly not claiming that the FDIC-R should also be made a party to this case due to its role in the transaction. Moreover, Columbian's "purchase" of the Participation carried with it the obligation to fund certain Loan proceeds to [the borrower].  Columbian did in fact fund approximately $3 million of the $6 million committed. . . .  Yet LNV purchased its Participation Interest from the FDIC-R at a fraction of its face value. . . . By asking for rescission, is LNV seeking to have Columbian's $3 million "returned" to LNV?  Such a remedy would result in a windfall to LNV – all at the expense of a third party (OSM) who had nothing to do with the alleged fraud.
At this point, there is simply no way to equitably unwind the tangle of transactions that have grown around the Participation Agreement.

However, the Court is not persuaded that an appropriate remedy could not be fashioned if the contract were rescinded.  Rescission of a fraudulently induced contract is the "substantive right" of the defrauded party.  *Schenck*, 144 N.E. at 593.  The "election of remedies" follows from the exercise of that right.  *Id.*  And under New York law, "[i]f complete restoration is impossible[,] the terms upon which rescission will be granted rest within the sound discretion of the court. . . . The court should adjust the equities between the parties to avoid unjust enrichment . . . in order that no one be placed in a better position after rescission than when the contract was executed."  *Vitale v. Coyne Realty, Inc.*, 414 N.Y.S.2d 388, 393 (N.Y. App. Dept. 1979) (citations omitted).
Nevertheless, in light of the Court's conclusion that LNV is barred from proceeding on its fraudulent inducement defense by the terms of the Loan Sale Agreement, these considerations are not determinative here.

18

*malum prohibitum* may also be voided if: (1) the contract is still executory; or (2) the parties are not in pari delicto." *Korea Life Ins. Co., Ltd. V. Morgan Guar. Trust Co. of New York*, 269 F.Supp.2d 424, 441 (S.D.N.Y. 2003) (internal citations omitted). Performance in accordance with the terms of the Grande Palisades Participation Agreement is neither malum in se nor malum prohibitum, and the doctrine is inapplicable. *See also Lloyd Capital Corp. v. Pat Henchar, Inc.*, 603 N.E.2d 246, 248 (N.Y. 1992) ("As a general rule also, forfeitures by operation of law are disfavored, particularly where a defaulting party seeks to raise illegality as 'a sword for personal gain rather than a shield for the public good.' . . . Allowing parties to avoid their contractual obligations is especially inappropriate where there are regulatory sanctions and statutory penalties in place to redress violations of the law.") (internal citation omitted).

Therefore, the contract governs. In consequence, the non-contract claims that LNV has pled against OSM relating to the Grande Palisades dispute must now be dismissed as follows.

### 1. Civil theft.

First, in Count IX of its Complaint, LNV asserts a "civil theft/conversion" claim against OSM predicated on the allegation that OSM possesses certain monies that are owed to LNV under the terms of the Grande Palisades Participation Agreement. *Compare* Complaint ¶ 137, ECF No. 1 (asserting that OSM committed civil theft because it "took and/or possesses money that rightfully belongs to LNV as an approximate 2.12424110% owner of all Collections from the Grande Palisades Loan as set forth in more detail in the Grande Palisades Loan Participation Agreement"), *with* Complaint ¶ 131, ECF No. 1 (asserting that OSM committed breach of contract because it "failed to timely and promptly pay to LNV money it was owed as a

Participant pursuant to the terms of the Grande Palisades Loan Participation Agreement"). But under New York law, "[a] cause of action for conversion cannot be predicated on a mere breach of contract." *Fesseha v. TD Waterhouse Inv. Servs.*, 305 A.D.2d 268, 269 (N.Y. App. Div. 2003). This count is accordingly dismissed.

### 2. Unjust enrichment.

Second, in Count X, LNV asserts an "unjust enrichment/quantum meruit" claim against OSM that is also indistinguishable from its breach of contract claim. "Since a valid contract exists governing the subject matter in dispute, the cause of action for unjust enrichment is untenable." *G&G Investments, Inc. v. Revlon Consumer Products Corp.*, 724 N.Y.S.2d 411, 411 (N.Y. App. Dept. 2001). See also *Corsello v. Verizon New York, Inc.*, 967 N.E.2d 1177, 790-91 (N.Y. 2012) ("An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim."); *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E.2d 268, 274 (N.Y. 2009) ("Where the parties executed a valid and enforceable written contract governing a particular subject matter, recovery on a theory of unjust enrichment for events arising out of that subject matter is ordinarily precluded.").

This count is therefore dismissed as well.

### 3. Constructive trust.

Third, in Count XI, LNV asserts a constructive trust claim, "the purpose of [which] is prevention of unjust enrichment." *Simonds v. Simonds*, 380 N.E.2d 189, 194 (N.Y. 1978). *See also Beatty v. Guggenheim Exploration Co.,* 122 N.E. 378, 380 (N.Y. 1919) ("A constructive trust is the formula through which the conscience of equity finds expression. When property has

been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest[,] equity converts him into a trustee."). To maintain a constructive trust claim, New York courts generally require a plaintiff to establish four elements: "(1) a confidential or fiduciary relation, (2) a promise, (3) a transfer in reliance thereon and (4) unjust enrichment." *Sharp v. Kosmalski*, 351 N.E.2d 721, 723 (N.Y. 1976).

Because LNV does not have a viable unjust enrichment claim, its constructive trust claim necessarily fails as well. Furthermore, there is no genuine issue of material fact as to the existence of a confidential or fiduciary relationship here. "[B]anks who participate in loans together are not fiduciaries, but act at arm's length. . . . Any fiduciary duties between banks participating in a loan must be created by 'unequivocal language' in the Participation Agreement." *330 Acquisition Co. v. Regency Sav. Bank*, 306 A.D.2d 154, 155 (N.Y. App. Div. 2003) (citations omitted). *See also Banque Arabe*, 57 F.3d at 158 (noting that with regard to loan participation agreements, "there is deemed to be no fiduciary duty unless expressly and unequivocally created by contract"). The Grande Palisades Participation Agreement not only does not contain any such language, but it in fact specifically and unequivocally disclaims any "partnership[,] joint venture or other special relationship of any kind or nature" between the participant and the lender at § 3.2(b).

This count is therefore dismissed.

## II.      Bahia dispute.

The Grande Palisades portion of the case aside, OSM and BF-Negev have also moved for partial summary judgment on the non-contract claims that LNV pled against them in connection with the dispute over the participation interest that LNV acquired in the Bahia loan.

With regard to these matters, OSM asserts, and LNV does not dispute, that the Bahia Participation Agreement is governed by Minnesota law.  LNV also does not dispute the validity of the Bahia Participation Agreement itself.  In consequence, the non-contract claims that LNV asserts against BF-Negev and OSM and which flow from the Bahia Participation Agreement must now be dismissed as follows.

### A.  Civil theft.

At Count V of its Complaint, LNV asserts a "civil theft/conversion" claim against BF-Negev and OSM for allegedly possessing monies that LNV claims it is owed under the Bahia Participation Agreement.  But in Minnesota, "when the gravamen of the complaint is the breach of contract, the plaintiff may not recover tort damages," *McNeill & Assocs., Inc. v. ITT Life Ins. Corp.*, 446 N.W.2d 181, 185 (Minn. Ct. App. 1989), and even "[a] malicious or bad-faith motive in breaching a contract does not convert a contract action into a tort action," *Wild v. Rarig*, 234 N.W.2d 775, 790 (Minn. 1975).

This count is therefore dismissed.

### B.  Unjust enrichment.

Similarly, at Count VI, LNV asserts an "unjust enrichment/quantum meruit" claim against BF-Negev and OSM.  However, "proof of an express contract precludes recovery in quantum meruit." *Sharp v. Laubersheimer*, 347 N.W.2d 268, 271 (Minn. 1984) (quotation omitted).   This count is dismissed.

### C.  Constructive trust.

Finally, at Count VII, LNV asserts a constructive trust claim against BF-Negev and OSM.  To sustain a constructive trust claim, Minnesota law requires the presence of a fiduciary relationship between the parties.  *Peterson v. Holiday Recreational Indus., Inc.*, 726 N.W.2d 499, 507 (Minn. Ct. App. 2007).

The Minnesota Supreme Court has not specifically addressed the relationship between a lead lender and a participating bank in this context.  However, the Eighth Circuit has predicted that "Minnesota law would hold [a participant] to the marketplace standards of vigilance and independent inspection, and not grant it any protection beyond the express terms of the Participation Agreement."  *Leonard v. Dorsey & Whitney LLP*, 553 F.3d 609, 626 (8th Cir. 2009).  Here, the Bahia Participation Agreement does not impose any special duty of care on the lender; in fact, at § 4.2(c), it explicitly requires the lender only to "exercise that degree of care that would ordinarily be exercised by lenders administering a construction loan . . . ."

This count is therefore dismissed.

Based on the files, records, and proceedings herein, and for the reasons discussed above, IT IS ORDERED THAT:

1.  Defendants' Motion for Partial Summary Judgment [ECF No. 88] is GRANTED.

Dated: October 10, 2014                                s/Joan N. Ericksen
                                                       JOAN N. ERICKSEN
                                                       United States District Judge