LNV Corporation,

        Plaintiff,

                                  No. 13-cv-1926 (JNE/LIB)

v.                                     ORDER

Outsource Service Management, LLC
d/b/a Presidium Asset Solutions and
BF-Negev, LLC,

        Defendants.

This matter is before the Court on two motions for summary judgment brought by Plaintiff LNV Corporation. For the reasons discussed below, the non-contract claims that remain in this case – Counts I, II, and III of LNV's Complaint, and Counts Two and Three of the Counterclaims brought by Defendant Outsource Service Management, LLC ("OSM") – are dismissed. As for the breach of contract claims, partial summary judgment on liability is granted to LNV on Counts IV and VIII of its Complaint, and Count One of OSM's Counterclaims is dismissed.

Those rulings follow from the Court's conclusion that LNV has a 2.12424110% participation interest in the Grande Palisades loan. OSM has breached the Grande Palisades Participation Agreement by withholding from LNV its 2.12424110% share of the Collections received on the loan, less LNV's 2.12424110% share of the Extraordinary Expenses that have come due since September 30, 2009. In addition, it is established that LNV has a 3.33333333% participation interest in the Bahia loan. Defendant BF-Negev has breached the Bahia Participation Agreement by withholding from LNV its 3.33333333% share of the Collections received on that loan.

## Background

This case centers on participations in two construction loans, known as the Grande Palisades loan and the Bahia loan. None of the three litigants here was an original party to either of the Participation Agreements governing those two participations. OSM, a subsidiary of BF-Negev, succeeded to the role of the lead lender for the Grande Palisades loan, while BF-Negev succeeded to the role of lead lender for the Bahia loan. For its part, LNV succeeded to the role of a participating bank in each of the two loans.

The parties disagree about who owes money to whom with respect to these two participations. In its Complaint, LNV claimed on a variety of contract and non-contract theories that OSM and BF-Negev, in their roles as lead lenders, have improperly refused to disburse its share of the monies that have been collected on the two loans. Reading the contracts and law that govern the participations differently, OSM and BF-Negev asserted in their joint Answer and Counterclaims that it is LNV, in its role as participant in the two loans, who has failed to fulfill its obligation to pay its share of the loans' principal and administrative costs.

At the outset of the case, the Court heard two consecutive motions that LNV brought to dismiss a portion of the Defendants' counterclaims based on the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). As those motions implicated questions of fact that go to the heart of the case and which at that point had not been adequately developed, both of them were denied without prejudice. LNV subsequently filed a motion to certify that decision for an interlocutory appeal to the Eighth Circuit, which was denied.

The case then proceeded through discovery. While it was ongoing, OSM and BF-Negev brought a motion for partial summary judgment requesting that the Court dismiss a number of

the non-contract claims that LNV pled against them because the parties' disputes over the two participations are governed by valid and binding contracts. That motion was granted.

Discovery has since closed, and LNV has filed in sequence the two motions for summary judgment that are currently before the Court.

## Discussion

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether summary judgment is warranted, the record "evidence and all fair inferences from it must be viewed in the light most favorable to the non moving party . . . ." *Johnson v. Blaukat,* 453 F.3d 1108, 1112 (8th Cir. 2006).

With its two motions for summary judgment, LNV mounts a challenge to OSM's standing to bring its counterclaims, while also seeking a ruling in its favor on the merits of the parties' discrepant accounts of their rights and obligations with respect to the two participations at issue. In addition, as briefing on the motions proceeded, the Court raised the issue of subject matter jurisdiction, which the parties have separately addressed.

All of these issues are discussed below.

## I.        Grande Palisades loan participation.

The bulk of the controversy in this case centers on the participation LNV acquired in the Grande Palisades construction loan, for which OSM succeeded to the position of lead lender and servicer. The Court therefore starts there.

LNV and OSM have been at odds for several years about how to settle accounts with respect to this participation. There are no genuine disputes, however, about the following facts. Marshall Financial Group of Minneapolis originated the Grande Palisades loan in the spring of 2007. Under the terms of that loan, Marshall as the lead lender was to disburse $140 million in principal in installments to a developer to build a hotel and condominium complex called the Grande Palisades Resort at Lake Austin Reserve in Orlando, Florida.

To fund the loan, Marshall sold participations to 65 other financial institutions. One of those was Columbian Bank of Topeka, Kansas, which acquired a 4.28571429% participation interest in the loan through a Participation Agreement with Marshall. In that contract, Columbian committed to funding $6 million – 4.28571429% – of the $140 million principal that the lead lender had committed to providing the borrower. By the terms of the Participation Agreement, this was to be accomplished by Columbian paying Marshall for 4.28571429% of each disbursement, or "Advance," of principal to the borrower. Columbian also agreed to reimburse the lead lender for 4.28571429% of the "Extraordinary Expenses" it would incur in administering and enforcing the terms of the construction loan. In return, the lead lender was to pay Columbian a 4.28571429% share of the "Collections," which the contract defines as "all monies or other property received" by the lead lender "with respect to" the Grande Palisades loan.

This arrangement went smoothly for over a year. Columbian funded its 4.28571429% share of each of the first 23 Advances, or "Draws," for a total of just under $3 million. That amount equates to 2.12424110% of the $140 million principal of the construction loan.

Then, on August 22, 2008, Columbian was closed by the Kansas Office of the State Bank Commissioner. The Federal Deposit Insurance Corporation ("FDIC") was appointed as receiver

for Columbian and succeeded to all its assets and liabilities, including the Participation Agreement. Shortly thereafter, in early September of 2008, the borrower on the Grande Palisades loan submitted a request for Draw # 24. The servicer of the loan subsequently issued a "Draw Notification" to Columbian, directing it to fund its 4.28571429% share of the draw. Neither Columbian nor the FDIC-R did so. Instead, Marshall funded Columbian's share of Draw #24, as it was authorized to do by the terms of their Participation Agreement.

Later that same month, Marshall entered into a Funding Agreement with 24 other participants in the Grande Palisades loan, referred to collectively as the "Contributing Participants." In that contract, the Contributing Participants agreed to reimburse Marshall for Columbian's share of Draw # 24 and to cover any future Advances that Columbian "fail[ed] to honor." In exchange, Marshall agreed to assign to the Contributing Participants the portion of Columbian's participation that they funded.

Thereafter, through the summer of 2009, the borrower requested and Marshall disbursed Draws # 25-43. The servicer continued to issue Draw Notifications to Columbian for each of them, "at least" through Draw # 33. Neither Columbian nor the FDIC-R funded Columbian's 4.28571429% share of any of these Advances and so, as they had committed to in the Funding Agreement, the Contributing Participants did. All told, by the time the last of the principal was disbursed to the borrower in the summer of 2009, the Contributing Participants had paid over $3 million of the $6 million in principal that Columbian had committed to funding in its Participation Agreement with Marshall.

On September 30, 2009, the FDIC-R sold Columbian's interests in a package of loans, including its participation in the Grande Palisades loan, to LNV through a Loan Sale Agreement.

At roughly the same time, as the result of a series of assignments, OSM succeeded to the roles of lead lender and servicer of the Grande Palisades loan.

With LNV thus in the position of participant and OSM as lead lender, the parties soon found themselves at an impasse. LNV, objecting to OSM's refusal to provide it with requested documentation, refused OSM's demands that it pay a full 4.28571429% share of both the loan principal and the Extraordinary Expenses. (All told, Marshall and OSM incurred approximately $14 million in Extraordinary Expenses, much of which is attributable to OSM's efforts after the September 30, 2009 date of the Loan Sale Agreement to collect amounts due from the borrower, which defaulted, and to obtain control of the collateral securing the construction loan.) For its part, when OSM sold the note on the Grande Palisades loan for $30 million in June of 2013, it refused to disburse any of those Collections to LNV.

Therefore, in July of 2013, LNV commenced this action. As noted, LNV in its Complaint asserted a number of claims against OSM on both contract and non-contract theories. After the Court's prior rulings, the claims that remain for LNV in this portion of the case are:

- a request at Count III for a declaration: of the participation percentage that LNV holds in the Grande Palisades loan; that LNV is entitled by the Grande Palisades Participation Agreement to an accounting from OSM of all Collections on the loan; and that LNV is entitled to its percentage share of those Collections, including specifically its percentage share of the $30 million that OSM received from the sale of the note on the loan;

- a breach of contract claim at Count VIII, through which LNV claims that OSM has breached the Grande Palisades Participation Agreement by failing to provide it with an accounting and by refusing to disburse its percentage share of the Collections; and

- a request at Count I for a declaration that, by operation of the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), OSM "possesses no claim against LNV related to any alleged violation of the Grande Palisades Loan Participation Agreement based on events that occurred prior to LNV taking an assignment of the Columbian Participation Interest."

OSM's two live counterclaims[1] are as follows:

- a breach of contract claim at Count One, through which OSM claims that LNV has breached the Grande Palisades Participation Agreement by failing to pay its percentage share of Advances, Extraordinary Expenses, and servicing fees to it as the lead lender and servicer; and

- a request at Count Two for a declaration that "FIRREA . . . does not act as a jurisdictional bar to OSM's affirmative claims for relief against LNV."

There is no discussion on the motions before the Court of the accounting provisions of the Grande Palisades Participation Agreement.  LNV also does not request, either in its briefing or through its proposed orders, that the Court order an accounting in relation to the Grande Palisades loan.

But, what is certainly intensely debated on these motions is the participation percentage that LNV holds in the Grande Palisades loan.  LNV asserts that it is 2.12424110%, equivalent to the portion of the principal that Columbian funded before it failed and LNV purchased the participation from the FDIC-R on September 30, 2009.  Therefore, LNV is suing OSM for 2.12424110% of the Collections on the loan, less that share of the Extraordinary Expenses that came due after September 30, 2009.  By all appearances, that calculation would amount to a recovery of several hundred thousand dollars for LNV.

---

[1]       OSM also pled at Count Three a counterclaim for unjust enrichment.  The Court has previously determined that the dispute between LNV and OSM arising from the Grande Palisades loan is governed by valid and enforceable written contracts.  *See* Order of Oct. 10, 2014, ECF No. 114.  Therefore, LNV argues in its first Motion for Summary Judgment that OSM can no longer maintain its unjust enrichment claim.  *See, e.g., IDT Corp. v. Morgan Stanley Dean Witter & Co.,* 907 N.E.2d 268, 274 (N.Y.2009) ("Where the parties executed a valid and enforceable written contract governing a particular subject matter, recovery on a theory of unjust enrichment for events arising out of that subject matter is ordinarily precluded.").

OSM agrees with LNV on this point.  LNV's first Motion for Summary Judgment is therefore granted in this respect only, and OSM's claim against LNV for unjust enrichment at Count Three of its Counterclaims is dismissed.

However, in OSM's view, LNV succeeded to and assumed Columbian's full 4.28571429% participation in the Grande Palisades loan. Therefore, the implication of OSM's position is that LNV may receive that share of the Collections, but only after paying that share of the principal and Extraordinary Expenses. Because the more than $3 million of principal that Columbian committed to but ultimately did not fund is significantly larger than 4.28571429% of the Collections received on the loan, LNV would, by this theory, owe OSM several million dollars.

At bottom, LNV and OSM are each claiming that the other has materially breached the Grande Palisades Participation Agreement: LNV contends that OSM has improperly failed to disburse its share of the Collections, while OSM argues that LNV has improperly failed to pay its share of the Advances and Extraordinary Expenses. The Participation Agreement is governed by New York law, under which "the essential elements of a cause of action to recover damages for breach of contract [are] the existence of a contract, the plaintiff's performance under the contract, the defendant's breach of that contract, and resulting damages . . . ." *JP Morgan Chase v. J.H. Elec. of New York, Inc.*, 893 N.Y.S.2d 237, 239 (N.Y. App. Div. 2010). The parties do not address damages on these motions; the remaining elements are the heart of the matter here.

In sum, then, the principal question the parties have presented to the Court is whether LNV holds a 2.12424110% or a 4.28571429% participation interest in the Grande Palisades loan. The answer, which will dictate the outcome of the parties' competing breach of contract claims, depends upon the impact on LNV's participation interest of the Funding Agreement, the Loan Sale Agreement, and FIRREA. They will be treated in turn.

**A. Funding Agreement.**

The first issue for consideration is the effect of the Funding Agreement on the participation LNV acquired. In LNV's view, the Contributing Participants committed themselves in the Funding Agreement to cover Columbian and/or the FDIC-R's share of Draw # 24 and all future Draws, thereby relieving Columbian and/or the FDIC-R of the obligation to do so under the Participation Agreement. Furthermore, LNV contends that the Funding Agreement "does not contemplate, nor does it provide a mechanism for, reimbursement of the Contributing Participants for the funds they advanced." Therefore, LNV says, the Funding Agreement permanently "diluted" Columbian's participation in the Grande Palisades loan from the 4.28571429% interest it had acquired through the Participation Agreement to the 2.12424110% of the loan that it had funded through Draw # 23. LNV contends that this "diluted" 2.12424110% participation is what the FDIC-R later sold to it in the Loan Sale Agreement.

On that interpretation of the Funding Agreement, LNV also mounts an attack on OSM's standing to bring its counterclaims. LNV argues that, because the Funding Agreement effectively replaced Columbian's commitment to fund 4.28571429% of the relevant Advances with the Contributing Participants', the lead lender suffered no injury-in-fact from the failure of Columbian and/or the FDIC-R – and now, LNV – to pay those amounts. Additionally, LNV contends that the Contributing Participants are the real parties in interest because OSM would presumably be obliged to distribute any amounts LNV would pay here towards the unfunded portion of Columbian's $6 million commitment to them.

In response to these arguments, OSM asserts that LNV is misreading the Funding Agreement. The Court agrees. The premise on which LNV bases both its standing and merits arguments – that the Funding Agreement relieved Columbian and/or the FDIC-R of the

obligation under the Participation Agreement to fund a full 4.28571429% of the principal of the Grande Palisades loan – is incorrect.

### 1. Merits.

The Funding Agreement and Participation Agreement contain identical provisions specifying that they, "(including the construction, validity and interpretation of [their] terms, conditions, provisions, and performance of obligations) shall be governed by, and construed in accordance with, the laws of the State of New York (other than its conflicts of laws rules)."  And both LNV and OSM apply New York law to those contracts.  New York requires courts to adhere to

> several cardinal principles of contractual interpretation.  A written agreement that is clear, complete and subject to only one reasonable interpretation must be enforced according to the plain meaning of the language chosen by the contracting parties . . . . To determine whether a writing is unambiguous, language should not be read in isolation because the contract must be considered as a whole . . . . Ambiguity is determined within the four corners of the document; it cannot be created by extrinsic evidence that the parties intended a meaning different than that expressed in the agreement and, therefore, extrinsic evidence "may be considered only if the agreement is ambiguous" . . . . Ambiguity is present if language was written so imperfectly that it is susceptible to more than one reasonable interpretation . . . .

*Brad H. v. City of New York*, 951 N.E.2d 743 (N.Y. 2011) (internal citations omitted).  What's more, "[d]ue consideration must be given to the purposes of the parties in making the contract, and a fair and reasonable interpretation consistent with that purpose must guide the courts in enforcing the agreement . . . ."  *Tougher Heating & Plumbing Co. v. State*, 423 N.Y.S.2d 289, 291 (N.Y. App. Div. 1979).

Considered as a whole, the Funding Agreement is clearly intended to serve as a workaround for the shortfall of principal created by Columbian and/or the FDIC-R's failure to fund Draws # 24-43, not as absolution of it.  The Funding Agreement itself states plainly that the

arrangement between Marshall and the Contributing Participants that it memorializes was born of § 4.5(a) of the Participation Agreement between Columbian and Marshall.  That provision reads as follows:

> If [Columbian] fails to fund its share of an Advance or remit its proportionate share of any Extraordinary Expenses, [Marshall] may, at its option and in its sole discretion (without limiting or prejudicing its rights under this Agreement), make such Advance and pay such expenses, as may be necessary to provide for the payment in full of [Columbian's] share of such Advance or administration of the Credit in the case of expenses, but without relieving [Columbian] of its obligations under this Agreement, and to the full extent of any such Advance it makes or expense it pays, succeed to the interest of [Columbian] with respect thereto until such amount is remitted by [Columbian] to [Marshall], and the percentage interests of the Participants and [Marshall] shall be automatically adjusted to reflect such additional advance and payments by [Marshall], as the case may be.

Furthermore, § 3.1(b) of Columbian's Participation Agreement reserves for Marshall "the right . . . [t]o sell or assign all or any part of its Retained Interest" – in other words, the percentage interest Marshall holds in the Grande Palisades loan.

The prudence of including these provisions in the context of a large participated construction loan is self-evident.  As the Funding Agreement recites, it was Marshall who had "made a commitment to make advances to Borrower to construct the Project . . . ."  The participants had made a commitment to Marshall to fund those Advances, but they had no contractual ties to the borrower or, for that matter, to each other.  In this sort of arrangement, the failure of even one of the 65 participating banks to honor its commitment to Marshall carried the potential to derail the entire project, to the detriment of all involved.  To avoid that result, the Participation Agreement empowers Marshall to take steps to meet its own contractual obligation to disburse principal to the borrower in the event that any portion of a disbursement that a participant had committed to funding was not forthcoming.

The Funding Agreement is an exercise of this right to self-help. With the Funding Agreement, Marshall signaled its intent "to fund the Pro Rata Share . . . of any Advance authorized by Lender that Columbian fails to honor (the 'Columbian Shortfall')" and "to succeed to Columbian's Participation Interest up to the extent of any Columbian Shortfall" under § 4.5(a) of the Participation Agreement. Simultaneously, and as it was entitled to do by § 3.1(b) of the Participation Agreement, Marshall agreed to assign the portion of Columbian's participation interest that it acquired to the Contributing Participants in exchange for payment in the amount of the shortfall.

The Participation Agreement unambiguously states that Marshall exercises its rights under § 4.5(a) "without relieving [Columbian] of its obligations under this Agreement." Primary among Columbian's obligations under the Participation Agreement, of course, is its commitment to fund $6 million of the $140 million Grande Palisades loan principal by paying 4.28571429% of each successive Advance. And, to further underscore the stopgap nature of Marshall's exercise of its § 4.5(a) rights, that provision of the Participation Agreement plainly states that Marshall may only "succeed to the interest of [Columbian] with respect [to its unfunded share of any Advances] until such amount is remitted by [Columbian] to Lender . . . ." Nothing in the Funding Agreement is to the contrary.

### 2. Standing.

It follows, then, that LNV's challenge to OSM's standing to press its counterclaims and its status as the real party in interest must fail. To have standing, OSM must show (1) that it has personally suffered an "injury in fact" (2) that is "fairly traceable to the challenged action" and

(3) that is "likely [to] be redressed by a favorable decision." *Lujan v. Defenders of Wildlife,* 504

U.S. 555, 560–61 (1992). As for whether OSM is the "real party in interest,"

> Federal Rule of Civil Procedure 17(a) provides that every "action must be prosecuted in the name of the real party in interest." The function of this rule "is simply to protect the defendant against a subsequent action by the party actually entitled to recover, and to insure generally that the judgment will have its proper effect as res judicata." Fed.R.Civ.P. 17(a) advisory committee note (1966). Accordingly, Rule 17(a) requires that the plaintiff "actually possess, under the substantive law, the right sought to be enforced." *United HealthCare Corp. v. Am. Trade Ins. Co., Ltd.,* 88 F.3d 563, 569 (8th Cir.1996). . . .

*Curtis Lumber Co. v. Louisiana Pac. Corp.*, 618 F.3d 762, 771 (8th Cir. 2010). *Cf. Lexmark*

*Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 (2014) (noting that the

Supreme Court has "adverted to a 'prudential' branch of standing, a doctrine not derived from

Article III and 'not exhaustively defined' but encompassing (we have said) . . . '"the general

prohibition on a litigant's raising another person's legal rights"'") (citation omitted).

The Court readily concludes that OSM has made an adequate showing on all three

elements of standing and that it is seeking through its counterclaims to enforce its own rights

under the Participation Agreement as Marshall's successor. Columbian committed in the

Participation Agreement to paying Marshall for 4.28571429% of each Advance, and it and/or the

FDIC-R failed to do so. That failure deprived Marshall of promised funds with which to

disburse Draws #24-43 to the borrower. There is no doubt that that constitutes a concrete and

particularized injury. That Marshall then took action to secure from the Contributing

Participants the funds that Columbian and/or the FDIC-R failed to provide, rather than absorbing

the shortfall itself or allowing the Grande Palisades project to collapse, does not nullify that

injury and is of no moment in a standing analysis. *See Sprint Commc'ns Co., L.P. v. APCC*

*Servs., Inc.*, 554 U.S. 269, 287 (2008) ("Here, a legal victory would unquestionably redress the

*injuries* for which the [plaintiffs] bring suit. . . . What does it matter what the [plaintiffs] do with

the money afterward?  The injuries would be redressed whether the [plaintiffs] remit the litigation proceeds to [third parties], donate them to charity, or use them to build new corporate headquarters.").

Furthermore, the Contributing Participants are not parties to the Participation Agreement between Marshall and Columbian, and they have never had any contractual relationship with Columbian, the FDIC-R, or LNV.  The Participation Agreement undoubtedly gives Marshall and its successors the right to seek redress for the failure of Columbian and/or the FDIC-R to fulfill the commitment to fund 4.28571429% of the loan principal, and it gives Columbian and its successors the complementary right to reclaim the forfeited portion of its participation interest if and when it makes good on that commitment.  Marshall did not assign its right of redress to the Contributing Participants; with the Funding Agreement, Marshall assigned only the unfunded portion of Columbian's participation percentage.  The Contributing Participants thus took that interest subject to Marshall's retention of its right to pursue Columbian or its successors for the unfunded portion of its $6 million commitment.  Indeed, the Funding Agreement clearly states that "[t]he terms and conditions of the Participation Agreements shall remain in full force and effect and shall govern all Advances, except as specifically modified by the terms and conditions of this Agreement."

LNV has never contested that Marshall later assigned the rights it retained under the Participation Agreement – including the right to seek redress – to OSM.  OSM thus "stands in the shoes" of Marshall with regard to claims arising from the injury it suffered by the Columbian shortfall, as it is clear that "the assignee of a claim has standing to assert the injury in fact suffered by the assignor."  *Vermont Agency of Natural Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 773 (2000).  *See also Sprint*, 554 U.S. at 290 ("Here, the [plaintiffs] are suing based on *injuries*

originally suffered by third parties. But the [third parties] assigned to the [plaintiffs] all 'rights, title and interest' in claims based on those injuries. Thus, in the litigation before us, the [plaintiffs] assert what are, due to that transfer, *legal rights of their own*."). Whether LNV assumed Columbian's liability to OSM on the claims arising from that injury is, of course, the central question before the Court on these motions.

In sum, then, the Funding Agreement neither absolved Columbian and/or the FDIC-R of the obligation to fund 4.28571429% of Advances and Extraordinary Expenses under the Participation Agreement, nor is it a barrier to OSM's efforts as Marshall's successor to enforce those commitments against LNV as Columbian's successor.


**B. Loan Sale Agreement.**

The second issue to consider is the effect of the Loan Sale Agreement on the participation LNV holds in the Grande Palisades loan. As discussed above, Columbian and/or the FDIC-R's obligation under the Participation Agreement to fund 4.28571429% of each Advance and pay 4.28571429% of the Extraordinary Expenses was not relieved by the Funding Agreement between Marshall and the Contributing Participants. But even so, LNV argues in the alternative that it did not assume that commitment when it acquired Columbian's participation from the FDIC-R in the Loan Sale Agreement. LNV contends that, in that contract, it agreed to assume only the obligations that arose under the Participation Agreement on or after September 30, 2009. Because no Advances were made to the borrower on or after that date – all of the principal had been disbursed by then – LNV contends that it is not responsible for funding a 4.28571429% share of Draws # 24-43.

OSM again responds that LNV is misreading the contract. According to OSM, LNV agreed in the Loan Sale Agreement to assume all obligations under the Participation Agreement, whenever they arose.

On the record before the Court, this issue cannot be resolved through a summary judgment.

### 1. Standing.

As a threshold matter, LNV argues that OSM may not press its interpretation of the Loan Sale Agreement here because it is neither a party to nor a third-party beneficiary of that contract and therefore "lacks standing to enforce" it. In support of this argument, LNV relies in large measure on *Interface Kanner, LLC v. JPMorgan Chase Bank, N.A.*, 704 F.3d 927 (11th Cir. 2013). In that case, the plaintiff had entered into a lease agreement with a bank to construct a branch location for it. *Id.* at 929. Prior to performance, the bank failed and entered receivership with the FDIC. *Id.* As receiver, the FDIC then entered into a Purchase and Assumption ("P&A") Agreement with the defendant, whereby the defendant "acquired some, but not all, of the assets and liabilities which [had] passed from [the failed bank] to the FDIC." *Id.* at 930. That P&A Agreement provided the defendant with "the option to accept or reject 'Bank Premises' leases, [but] it [did] not include a similar allowance for 'Other Real Estate' leases." *Id.* The FDIC and the defendant both understood that the failed bank's lease with the plaintiff was a "Bank Premises" lease, and the defendant subsequently exercised its option to reject that contract. *Id.* Accordingly, "the FDIC continued to treat the [failed bank's lease with the plaintiff] as a retained liability" of the receiver. *Id.* The FDIC later disaffirmed the lease, in the

exercise of its right as receiver under 12 U.S.C. § 1821(e)(1)(B) to "dissafirm or repudiate any contract or lease . . . the performance of which [it] determines to be burdensome."  *Id.*

Evidently dissatisfied with that outcome, the plaintiff then filed suit against the defendant, claiming that the defendant had "automatically" assumed the lease in the P&A Agreement – in other words, without the option to reject it – and subsequently breached and/or abandoned it.  *Id.*  Applying federal common law, the Eleventh Circuit determined that the plaintiff could "only establish standing" to bring its breach claim against the defendant "if it [was] an intended third-party beneficiary of the P&A Agreement."  *Id.* at 932.  To establish that it was entitled to that status, the plaintiff was required to demonstrate that the parties to the P&A Agreement "clearly intended" that it be benefited by that contract.  *Id.* at 932-33.  Relying on a provision of the P&A Agreement stating that "it [is] the intention of the parties hereto that this Agreement . . . [is] for the sole and exclusive benefit of the Receiver, the Corporation and [the defendant] and for the benefit of no other person," the court concluded that the plaintiff had not made that showing and ordered the case dismissed.  *Id.* at 930, 933-34.

This decision is readily distinguishable.  *Interface Kanner* and a similar decision from the Ninth Circuit turn on the language in the P&A Agreement that unequivocally disclaims all third-party beneficiaries but those specifically named in the contract.  *See Excel Willowbrook, L.L.C. v. JP Morgan Chase Bank, Nat. Ass'n*, 758 F.3d 592, 597 (5th Cir. 2014) (noting that, "[a]s the FDIC's assignment to [the defendants] included a no-beneficiaries clause, the courts reasoned, the [plaintiffs] could not possibly overcome th[e] presumption" against third-party beneficiary status with respect to government contracts).  But the Loan Sale Agreement between the FDIC-R and LNV at issue here contains no such language; that contract indicates only that it is to "inure

to the benefit" of those two parties and that the FDIC "in its corporate capacity shall be a third-party beneficiary."

The absence of a "no-beneficiaries clause" in the Loan Sale Agreement is consequential. As the Eleventh Circuit noted, a party "need not be specifically or individually identified in the contract" in order to qualify as an intended third-party beneficiary, so long as that party "fall[s] within a class clearly intended to be benefited thereby." *Id.* at 933 (quoting *Montana v. United States*, 124 F.3d 1269, 1273 (Fed. Cir. 1997)). And, in the absence of a disclaimer to the contrary, the assignment of contractual obligations by an obligor – government entity or not – to another party is clearly intended to benefit the obligee. *See Entergy Arkansas, Inc. v. Nebraska*, 358 F.3d 528, 547 (8th Cir. 2004) (finding that the Restatement (Second) of Contracts is "an appropriate reference" in formulating the federal common law of contracts); Restatement (Second) of Contracts § 302(1) (1981) ("*Unless otherwise agreed between promisor and promisee*, a beneficiary of a promise is an intended beneficiary if recognition of a right of performance in the beneficiary is appropriate to effectuate the intention of the parties and . . . the performance of the promise will satisfy an obligation of the promise to pay money to the beneficiary . . . .") (emphasis added).

The Loan Sale Agreement is such a contract; it evinces a clear intention to benefit the lead lender of the Grande Palisades loan, whom Columbian had committed in the Participation Agreement to paying a share of all Advances and Extraordinary Expenses. Indeed, the very purpose of the Loan Sale Agreement was for the FDIC-R to assign and for LNV to assume the rights and "the Obligations" – which the contract defines specifically to include "the commitment to make advances of funds to or for the benefit of a Borrower" – "under and with respect to all the Notes and Collateral Documents," including the Grande Palisades Participation

Agreement. Consequently, the Court concludes that OSM is not precluded from pressing its interpretation of the Loan Sale Agreement here.

### 2. Merits.

Turning then to the merits of the parties' dispute over the scope of the obligations LNV assumed through the Loan Sale Agreement, that contract specifies that it is to be "control[led]" by the "[f]ederal law of the United States," but, "[t]o the extent that federal law does not supply a rule of decision, [it] shall be governed by, and construed and enforced in accordance with, the laws of the State of New York." Both LNV and OSM apply the federal common law of contracts to the Loan Sale Agreement.

The Court perceives no material difference between the relevant aspects of federal common law and New York law; both follow generally-recognized principles of contract interpretation. *Priebe & Sons v. United States*, 332 U.S. 407, 411 (1947) ("It is customary, where Congress has not adopted a different standard, to apply to the construction of government contracts the principles of general contract law."). And

> [t]he fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent . . . . "The best evidence of what parties to a written agreement intend is what they say in their writing" . . . . Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms . . . .

*Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170-71 (N.Y. 2002) (citations omitted).

To determine the scope of the obligations LNV assumed from the FDIC-R in the Loan Sale Agreement, the parties focus on two separate provisions of that contract. The plain meaning of those two provisions point to two different results. The first, at Article 2.1, states that "[the FDIC-R] agrees to assign and [LNV] agrees to assume all of the Obligations of [Columbian] or

[the FDIC-R] under and with respect to all the Notes and Collateral Documents."[2] By its plain language, this provision purports to transfer from the FDIC-R to LNV the obligation to cover Columbian's share of Advances and Extraordinary Expenses under the Grande Palisades Participation Agreement, without regard to when those Advances and Extraordinary Expenses came due.

However, the second relevant provision in the Loan Sale Agreement, which appears in the "Assignment and Assumption of Interests and Obligations" at Attachment D, states that LNV "assumes all Obligations arising from and after the date hereof" – September 30, 2009. By its plain language, this provision purports to transfer from the FDIC-R to LNV only the obligation to cover Columbian's share of Advances and Extraordinary Expenses that came due under the Participation Agreement after the date of the assignment; any obligations to cover Advances and Extraordinary Expenses that pre-exist that date necessarily arose before it and would therefore be retained by the FDIC-R.

Faced with this apparent conflict, OSM urges the Court to find that the unqualified language of assumption at Article 2.1 takes precedence over the qualified language in Attachment D. OSM emphasizes that Attachment D contains a provision specifying that the assumption it memorializes "is made, executed and delivered pursuant to the LSA, and is subject to all of the terms, provisions and conditions thereof." This, however, cannot be dispositive, as the contract lends itself just as well to the opposite argument – that Article 2.1 is "subject to" the terms of Attachment D. Notably, Article 2.1 specifies that the assumption to which it refers

---

[2]	Article 5.1 of the Loan Sale Agreement is consistent with Article 2.1; it states that LNV "accepts and assumes and expressly agrees to perform in accordance with the terms, all Obligations under the Note or Collateral Documents, including without limitation, all obligations for Disbursements of Principal . . . ."

"shall be on the terms and subject to the conditions set forth in this Agreement," which is defined to include both "this Loan Sale Agreement and the Attachments hereto."[3]

For its part, LNV contends that the Court should find that the "specific terms" of Attachment D control over the "general terms" of Article 2.1. *See* Restatement (Second) of Contracts § 203(c) (1981) (stating that "specific terms and exact terms are given greater weight than general language" in the interpretation of a contract). The Court, however, is not persuaded that this principle can be appropriately applied here. Article 2.1 and Attachment D speak with comparable specificity to LNV's assumption of Columbian and/or the FDIC-R's obligations under a series of contracts, including the Grande Palisades Participation Agreement. Article 2.1 simply evinces a broader assumption, and Attachment D a narrower one.

At bottom, "[a] contract is unambiguous if the language it uses has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion . . . .'" *Greenfield*, 780 N.E.2d at 171 (citation omitted). Despite the parties' respective efforts, the Court cannot say that the Loan Sale Agreement satisfies this standard. The contract is susceptible to more than one

---

[3]     In a related effort to resolve the apparent conflict between Article 2.1 and Attachment D, OSM also points to Article 10.8 of the Loan Sale Agreement. That provision states that "this Agreement shall in all instances be the controlling document with respect to the terms of the . . . assignment and assumption of all obligations" and that, "[i]n the event of a conflict between the terms of this Agreement and the terms of any other document or instrument executed in connection herewith and with the transactions contemplated hereby, . . . the terms of this Agreement shall control . . . ."

This provision does not render the terms of Article 2.1 "superior" to those of Attachment D as OSM contends. As noted, the contract defines "Agreement" to include both "this Loan Sale Agreement and the Attachments hereto." The conflict between Article 2.1 and Attachment D is therefore not "a conflict between the terms of this Agreement and the terms of any other document or instrument" to which Articl 10.8 could be applied; it is a conflict internal to the "Agreement."

reasonable interpretation regarding the scope of the obligations LNV assumed under the Participation Agreement, and it is therefore ambiguous.

Consequently, extrinsic evidence of the parties' intent may be considered. *Greenfield*, 780 N.E.2d at 171 ("Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous, which is an issue of law for the courts to decide . . . .") (citation omitted). However, as LNV and OSM both contend that the Loan Sale Agreement is unambiguous, neither make a clear argument regarding what the extrinsic evidence would reveal. With that said, LNV does point to evidence that "[d]ata provided by the FDIC-R while LNV was conducting its due diligence confirmed that Columbian's obligations [under the Participation Agreement] had been fully satisfied, showing a $0.00 unfunded commitment for Columbian's interest in the [Grande Palisades] loan." OSM argues in response that "the FDIC-R's 'data' tells the Court nothing about the interest LNV purchased [in the Grande Palisades loan]. At best, the FDIC-R's data sheds light on the interest LNV thinks it purchased. The former, not the latter, is dispositive."

The Court agrees with OSM on this issue. LNV has not carried its burden as the moving party to demonstrate that the intent of the FDIC-R and LNV with respect to the scope of the assignment and assumption of obligations "cannot be . . . genuinely disputed." Fed. R. Civ. P. 56(c)(1). Even assuming without deciding that the evidence to which LNV points does indisputably show that the FDIC-R and LNV both believed at the time they entered into the Loan Sale Agreement that "Columbian's obligations [under the Participation Agreement] had been fully satisfied," that belief has now been shown to have been mistaken. And the contract clearly indicates that the FDIC-R and LNV contemplated that risk: as OSM points out, in the Loan Sale Agreement, the FDIC-R expressly disclaimed making any "warranties or representation of any

kind or nature," both "as to the amount of any additional or future Disbursements of Principal [LNV] is required to make" and "as to the completeness or accuracy of any information provided by [the FDIC-R] with respect to any Loan."

Critically, though, LNV has provided no evidence of how it and the FDIC-R intended to allocate the risk that their belief that Columbian's participation was fully funded could turn out to be incorrect. LNV has thus failed to answer the dispositive question: did LNV assume that risk by agreeing to accept all obligations under the Participation Agreement, as Article 2.1 indicates; or did the FDIC-R assume that risk by agreeing to retain all obligations that arose before September 30, 2009, as Attachment D indicates? *See* Restatement (Second) of Contracts § 154 (1981) ("A party bears the risk of a mistake when . . . the risk is allocated to him by agreement of the parties . . . ."). The Court has no basis here on which to decide between those two possibilities as a matter of law.

As a result, what can be said definitively is that LNV assumed Columbian's obligations under the Participation Agreement via the Loan Sale Agreement with the FDIC-R at least insofar as those obligations arose on or after September 30, 2009. Whether through the Loan Sale Agreement LNV also assumed obligations that arose under the Participation Agreement before that date is disputed and, for the reasons explained above, it remains an open question.

### C.  FIRREA.

That, however, does not preclude a grant of summary judgment to LNV. Even if OSM were to prevail at trial on its contention that the FDIC-R intended to transfer and LNV intended to assume all obligations under the Participation Agreement regardless of when they arose, it

would be inconsequential in light of the third issue up for consideration – the effect of FIRREA on the parties' competing claims.

As it has throughout this litigation, LNV argues here that, even if it were found to have assumed from the FDIC-R the obligations that arose under the Participation Agreement prior to the date of the Loan Sale Agreement, the administrative exhaustion requirement imposed by FIRREA at 12 U.S.C. § 1821(d)(13)(D) would divest the Court of subject matter jurisdiction over the portion of OSM's counterclaims relating to those obligations.  *See Vill. of Oakwood v. State Bank & Trust Co.*, 539 F.3d 373, 385 (6th Cir. 2008) ("[E]very court that has addressed the issue has interpreted § 1821(d)(13)(D) 'as imposing a statutory exhaustion requirement rather than an absolute bar to jurisdiction.'") (citation omitted); *Bueford v. Resolution Trust Corp.,* 991 F.2d 481, 484 (8th Cir. 1993) ("Every court that has considered the issue has found exhaustion of FIRREA's administrative remedies to be a jurisdictional prerequisite to suit in district court. . . . We agree with the conclusion reached by the other circuits.").  The Court has to this point deferred ruling on this issue.  But now, on these motions and with a fully-developed record before it, the Court agrees with LNV.

As is relevant here, there is no dispute that Columbian performed satisfactorily under the Participation Agreement through August of 2008, at which point it was closed by the Kansas Office of the State Bank Commissioner and the FDIC was appointed as receiver.  With that appointment, the FDIC-R succeeded to all of Columbian's assets and liabilities by operation of law, 12 U.S.C. § 1821(d)(2)(A), and it was obliged to "pay all [of Columbian's] valid obligations . . . in accordance with the prescriptions and limitations" contained in FIRREA, 12 U.S.C. § 1821(d)(2)(H).

Those obligations included Columbian's commitment under the Participation Agreement to fund 4.28571429% of each Advance and to pay 4.28571429% of the Extraordinary Expenses. If the FDIC-R determined that doing so would be "burdensome," it had the authority under FIRREA to "disaffirm or repudiate" the Participation Agreement "within a reasonable period following [its] appointment" as receiver and compensate the lead lender for its "actual direct compensatory damages." 12 U.S.C. § 1821(e)(1-3). It is undisputed, however, that the FDIC-R did not exercise that authority.

The FDIC-R therefore remained responsible, as Columbian's successor, for paying Columbian's "valid obligations" under the Participation Agreement. As explained above, those obligations were not relieved by the Funding Agreement between Marshall and the Contributing Participants. Yet, between September of 2008 and the summer of 2009, the FDIC-R did not fund Draws #24-43 and did not pay any Extraordinary Expenses. Only later, in September of 2009, did the FDIC-R transfer the Participation Agreement to LNV through the Loan Sale Agreement in the manner discussed above. *See* 12 U.S.C. § 1821(d)(2)(G)(i) (providing that the FDIC as receiver may "transfer any asset or liability of the institution in default . . . without any approval, assignment, or consent with respect to such transfer").

There is thus no other reasonable conclusion but that the failure to fund Draws #24-43 and to pay the Extraordinary Expenses that came due before the date of the Loan Sale Agreement was an act or omission of the FDIC in its capacity as receiver for Columbian, and that OSM's breach of contract counterclaim, through which it seeks to impose on LNV the responsibility to rectify that failure, is a claim relating to such act or omission.

FIRREA is thus implicated. That statute states at § 1821(d)(13)(D) that, "[e]xcept as otherwise provided in this subsection, no court shall have jurisdiction over . . . any claim relating

to any act or omission of the [FDIC] as receiver." The District of Columbia Circuit's cogent treatment of this provision of FIRREA is helpful here:

> The only clause of the subsection that "otherwise provide[s]" jurisdiction is 12 U.S.C. § 1821(d)(6), which provides for administrative determination of "any claim against a depository institution for which the Corporation is receiver" and thereafter for adjudication in district court. These two subsections would seem to set up a standard exhaustion requirement: (d)(6)(A) routes claims through an administrative review process, and (d)(13)(D) withholds judicial review unless and until claims are so routed. Their wording, however, creates a difficult interpretative problem: the jurisdiction-precluding language of (d)(13)(D) can accommodate quite a broad reading—broad enough to cover contracts between private parties and the FDIC as Receiver for a failed depository institution. But (d)(6)(A) is quite narrow—it allows judicial review, after administrative determination, of "any claim against a depository institution for which the Corporation is receiver." Thus, for claims that are not "against a depository institution" but that do fall within (d)(13)(D), the effect of the two sections, on a plain language approach, would be not to impose an administrative exhaustion requirement but to foreclose judicial jurisdiction altogether, a result troubling from a constitutional perspective and certainly not the goal of FIRREA. See generally, e.g., *Hudson United Bank v. Chase Manhattan Bank of Connecticut,* 43 F.3d 843, 848–49 (3d Cir.1994) ("Congress did not intend FIRREA's claims process to immunize the receiver, but rather wanted to require exhaustion of the receivership claims process before going to court."); *Homeland Stores, Inc. v. RTC,* 17 F.3d 1269, 1273–74 (10th Cir.1994) (assuming that "Congress intended those 'claims' barred by § 1821(d)(13)(D) to parallel those contemplated under FIRREA's administrative claims process"). A claim based on a contract with the FDIC as Receiver for a particular depository is one of the types of actions that fall into the gap. Such a contract might be either (1) one entered into in the first instance by the FDIC as Receiver, or (2) one inherited from a depository institution and accepted by the receiver, rather than being rejected pursuant to [the receiver's authority to "dissafirm or repudiate" any contract under] § 1821(e)(1) and (2). Such claims, particularly of the first sort, do not appear to be claims "against a depository institution" but they would, superficially, be ones "relating to any act or omission of ... the Corporation as receiver." How should a court resolve the problem? The obvious solution is to read (d)(6)(A) and (d)(13)(D) to apply to the same "claims." We have called this a " plausible" method of reconciliation, *Nat'l Trust for Historic Preservation v. FDIC,* 995 F.2d 238, 240 (D.C.Cir.1993), vacated 5 F.3d 567, reinstated in relevant part 21 F.3d 469 (D.C.Cir.1994), and other courts agree. See, e.g., *Rosa v. RTC,* 938 F.2d 383, 394 (3d Cir.1991) (stating that (d)(13)(D) bar applies only to claims "susceptible of resolution through the claims procedure"); see also *Henderson v. Bank of New England,* 986 F.2d 319, 321 (9th Cir.1993) (same, quoting *Rosa*).

There are two possible ways to produce such a harmonious reading of "claims".
One may either read (d)(6)(A) broadly, ignoring the phrase "against a depository
institution," or read (d)(13)(D) narrowly, implying the phrase "against a
depository institution" on the basis of the statute's general focus on such claims.
See *Office and Professional Employees International Union v. FDIC,* 962 F.2d
63, 68 (D.C.Cir.1992) ("*OPEIU*"). The circuits have split on which approach to
take. Compare *Stamm v. Paul,* 121 F.3d 635 (11th Cir.1997) (applying §
1821(d)(6) to claim against receiver); *Home Capital Collateral, Inc. v. FDIC,* 96
F.3d 760 (5th Cir.1996) (same); *Hudson,* 43 F.3d at 848–49 (same) with
*Homeland,* 17 F.3d at 1275 (holding administrative review process inapplicable to
claims accruing after RTC's appointment as receiver).

*Auction Co. of Am. v. F.D.I.C.*, 141 F.3d 1198, 1200-01 (D.C. Cir. 1998).

The parties, and the Court, are unaware of any decision in which the Eighth Circuit has
endorsed one of these two approaches over the other. *See RTC Mortgage Trust 1994-N2 v.
Haith*, 133 F.3d 574, 580 (8th Cir. 1998) ("The Eighth Circuit has, as yet, to expressly rule on
the question of whether FIRREA's administrative exhaustion requirements apply to post-
receivership conduct by the [FDIC], and we refrain from making that decision at this stage in the
present case."). As a result, the parties vigorously debate the point.

That debate is consequential because, as OSM concedes, neither it nor its predecessor
Marshall ever presented any claim to the FDIC-R relating to the Grande Palisades Participation
Agreement. OSM argues that this has no bearing on this case because, in its view, the FDIC-R's
post-appointment breach of its obligations as Columbian's successor under a pre-receivership
contract did not give rise to a "claim" that was subject to § 1821(d)'s administrative
determination procedures. Therefore, OSM contends, it cannot be precluded from bringing suit
on that breach here by § 1821(d)(13)(D). LNV, of course, argues just the opposite – that OSM's
counterclaim relating to the FDIC-R's breach of the Participation Agreement prior to the date of
the Loan Sale Agreement could have and must have been presented through the administrative
claims process and, because it was not, it must be dismissed under § 1821(d)(13)(D).

LNV has the better of this argument. While the circuit split over these two approaches appears to have persisted since the District of Columbia Circuit described the issue in 1998, it is not a close split. Indeed, it can now be said that "[t]he overwhelming majority of courts to address th[is] issue have concluded that the administrative process applies to post-receivership claims." *Vill. of Oakwood v. State Bank & Trust Co.*, 539 F.3d 373, 387 (6th Cir. 2008) (collecting cases). *Accord McCarthy v. F.D.I.C.*, 348 F.3d 1075, 1080 (9th Cir. 2003) ("Most circuit courts to consider this issue have determined that post-appointment claims against the FDIC are subject to FIRREA exhaustion. . . . Only the Tenth Circuit has gone the other way."). This Court is persuaded that weight of authority. Holding that claims relating to acts or omissions taken by the FDIC in its capacity as receiver for a failed bank are subject to FIRREA's administrative exhaustion requirement is consistent with "[o]ne of the important goals" of that statute – "to enable the receiver to efficiently determine creditors' claims and preserve assets of the failed institution without being burdened by complex and costly litigation," *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. City Sav., F.S.B.*, 28 F.3d 376, 388 (3d Cir. 1994), *as amended* (Aug. 29, 1994).

Nonetheless, OSM also emphasizes that 12 U.S.C. § 1821(d)(3)(B) requires the receiver to "promptly publish a notice to the depository institution's creditors to present their claims, together with proof, to the receiver by a date specified in the notice which shall be not less than 90 days after the publication of such notice," and that the FDIC-R accordingly set a "claims bar date" of November 25, 2008. Therefore, OSM contends, even if its counterclaim is among the type of claims that are subject to FIRREA's administrative exhaustion requirement, the portion of that counterclaim that rests on obligations that arose under the Participation Agreement after November 25, 2008 cannot be precluded by 12 U.S.C. § 1821(d)(13)(D).

This argument has found some purchase with the minority of courts that have held that FIRREA's exhaustion requirement does not apply to post-receivership claims. *See McCarthy*, 348 F.3d at 1081 (noting that the Tenth Circuit's decision in *Homeland Stores, Inc. v. Resolution Trust Corp.*, 17 F.3d 1269 (1994) rests "primarily on the basis that the statutory time limit for presenting claims renders the administrative process unavailable for post-receivership claims"). However, "[a]s those courts requiring exhaustion for post-receivership claims have pointed out, the FDIC has interpreted § 1821(d)(5)(C)(ii), which permits claimants who did not receive notice of the receiver's appointment to file after the bar date imposed by FIRREA has passed, also to permit late filing by those whose claims do not arise until after the deadline has passed." *Id. See also, e.g., Heno v. F.D.I.C.*, 20 F.3d 1204, 1209 (1st Cir. 1994) (noting that the "FDIC construes the pivotal statutory bar-date exception in subsection 1821(d)(5)(C)(ii) . . . as permitting late filing *even by claimants who were on notice of FDIC's appointment* but could not file their claim because it did not come into existence until after the bar date"). OSM does not challenge this "late filing" practice here and, notably, does not deny that it or Marshall could have filed claims with the FDIC-R after November 25, 2008 pursuant to § 1821(d)(5)(C)(ii).

Thus, on these facts, OSM's counterclaim for breach of contract – which rests on obligations that arose under the Participation Agreement before September 30, 2009 – is a "claim relating to any act or omission of the [FDIC] as receiver" within the meaning of 12 U.S.C. § 1821(d)(13)(D) for which it or its predecessor Marshall could and must have sought compensation through the administrative claims procedures outlined in 12 U.S.C. § 1821(d) before coming to federal court. The failure to satisfy that "precondition to civil litigation," *Haith,* 133 F.3d at 578, is dispositive here: the Court does not have subject matter jurisdiction over that counterclaim, and it is therefore dismissed. Neither the fact that OSM presses its

breach claim against LNV rather than the FDIC-R, nor the possibility that LNV could be found to have agreed to assume from the FDIC-R obligations that pre-existed the Loan Sale Agreement, has any bearing on this conclusion. *See, e.g., Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982) ("[N]o action of the parties can confer subject-matter jurisdiction upon a federal court."); *Am. First Fed., Inc. v. Lake Forest Park, Inc.*, 198 F.3d 1259, 1263 n.3 (11th Cir. 1999) ("[The plaintiff], having purchased the note from the [FDIC], stands in the shoes of the [FDIC] and acquires its protected status under FIRREA. . . . Thus, if [the defendant] is barred from asserting this [counter]claim against the [FDIC], it is similarly barred from asserting it against [the plaintiff]."); *Aber-Shukofsky v. JPMorgan Chase & Co.*, 755 F. Supp. 2d 441, 447 (E.D.N.Y. 2010) ("[C]ourts have consistently held that the plain language of § 1821(d)(13)(D) bars claims 'relating' to the acts of the receiver or seeking the assets of the failed bank, even when those claims are asserted against the third-party purchaser of failed-bank assets from the receiver.") (quotation omitted).

By application of 12 U.S.C. § 1821(d)(13)(D), then, LNV cannot be made to rectify the FDIC-R's failure to pay Columbian's share of the Advances and Extraordinary Expenses that came due before September 30, 2009, and it goes without saying that LNV will not do so voluntarily. In consequence, LNV holds a 2.12424110% participation interest in the Grande Palisades loan, equivalent to the 2.12424110% of the principal that Columbian funded before its closure. OSM has therefore breached the Grande Palisades Participation Agreement by withholding from LNV its 2.12424110% of the Collections on the loan – including specifically that share of the $30 million OSM received from the sale of the note – less 2.12424110% of the Extraordinary Expenses that came due on or after September 30, 2009.

Having so concluded, the Court does note that OSM argues briefly that it should not have to pay LNV its share of the Grande Palisades Collections because, at the time those Collections were received from the sale of the note in the summer of 2013, LNV was already in breach of the Participation Agreement by virtue of its refusal to pay its share of the Extraordinary Expenses that had come due since September 30, 2009. In support of this argument, OSM contends that, "[u]nder New York law, a party is excused from performing a contract if the other party breached the contract first."

That characterization of New York law, however, is imprecise. The principle that New York does recognize is that stated at § 237 of the Restatement (Second) of Contracts § 237 (1981): "[I]t is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time." *See U.W. Marx, Inc. v. Koko Contracting, Inc.*, 2 N.Y.S. 3d 276, 278 (N.Y. Sup. Ct. 2015) (finding that a party is relieved from performing its obligations under a contract by the other party's "prior . . . *uncured* failure of performance") (emphasis added) (citing Restatement (Second) of Contracts § 237 (1981)).

This principle is inapplicable here. After acquiring the participation interest through the Loan Sale Agreement, LNV did refuse to pay its 2.12424110% share of the Extraordinary Expenses that had come due since September 30, 2009. But, to the extent that that refusal constituted a material breach of the Participation Agreement, it was cured by OSM's own actions. For one, and as is discussed below in Section II, BF-Negev and OSM withheld more than $65,000 owing to LNV under the separate Bahia Participation Agreement in the fall of 2012 – well before the Grande Palisades Collections were received the following summer – specifically to *cure* LNV's alleged breach of the Grande Palisades Participation Agreement.

Even setting that aside, OSM has also, of course, withheld LNV's share of the Grande Palisades Collections. Indeed, at §§ 3.4(c) and 3.5, the Grande Palisades Participation Agreement expressly calls for OSM to pay LNV its share of the Collections only after paying itself for "unreimbursed or unpaid Extraordinary Expenses." By withholding LNV's share of the Grande Palisades Collections in its entirety, OSM more than "reimbursed" itself for LNV's share of the Extraordinary Expenses, yet OSM still refused to disburse the remainder. LNV's refusal to pay its share of the Extraordinary Expenses before the Collections were received therefore cannot justify or excuse OSM's refusal to deduct that amount from LNV's share of the Collections and pay it the rest.

As a final note on this portion of the case, both parties seek declarations relating to their dispute over the Grande Palisades participation: LNV at Counts I and III of its Complaint, and OSM at Count Two of its Counterclaims. The topics of those proposed declarations – the impact of FIRREA's administrative exhaustion requirement and the participation percentage that LNV holds – are part and parcel of the parties' competing breach of contract claims, and they have been thoroughly examined in that context above. Neither LNV nor OSM have addressed the need for these declarations in light of those core claims, and none is apparent to the Court. These requests for declaratory judgment are therefore dismissed. *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995) ("Since its inception, the Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants."); *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 241 (1937) (explaining that declaratory judgment is an appropriate remedy "[w]here there is . . . a concrete case admitting of an immediate and definitive determination of the legal rights of the parties" but "the adjudication of the rights of the litigants may not require the award of process

or the payment of damages"); *MASTR Asset Backed Sec. Trust 2006-HE3 ex rel. U.S. Bank Nat. Ass'n v. WMC Mortgage Corp.*, 843 F. Supp. 2d 996, 1001 (D. Minn. 2012) ("Declaratory relief should be denied when it will neither serve a useful purpose in clarifying and settling the legal relations in issue nor terminate the proceedings and afford relief from the uncertainty and controversy faced by the parties.") (quoting *United States v. Washington*, 759 F.2d 1353, 1356-57 (9th Cir. 1985)).

## II.    Bahia loan participation.

With the rights and obligations of LNV and OSM under the Grande Palisades Participation Agreement resolved in the manner explained above, the remainder of this case – the parties' dispute over the participation LNV holds in the Bahia loan – is comparatively uncomplicated.

The Bahia loan was made to a developer for the re-financing and construction of the Little Harbor Development near Tampa, Florida.  To fund the $30 million loan, the lead lender, BankFirst, entered into a number of participation agreements, including one in 2007 by which First Priority Bank acquired a 3.33333333% interest.  Through a series of assignments, LNV succeeded First Priority Bank as participant, BF-Negev succeeded BankFirst as lead lender, and OSM became the loan's servicer.  BF-Negev and OSM do not deny that LNV acquired First Priority Bank's full 3.33333333% participation interest, nor do they contest that that participation is fully funded and that LNV is therefore entitled to 3.33333333% of the Collections on the Bahia loan.

Nevertheless, controversy over LNV's participation in the Bahia loan arose as fallout from the standoff over LNV's Grande Palisades participation.  When the borrower on the Bahia

loan defaulted, BF-Negev foreclosed on the mortgage, bought the land securing the loan at a foreclosure sale, and then, in the fall of 2012, sold the land. After deducting expenses, the parties agree that LNV was entitled to receive approximately $65,000 from the proceeds of that land sale under the terms of the Bahia Participation Agreement. However, BF-Negev and OSM unilaterally withheld that amount from LNV, characterizing it as a set-off against what they believed LNV owed to OSM under the Grande Palisades Participation Agreement.

LNV attacks that set-off in this litigation, claiming in Count IV of its Complaint that BF-Negev breached the Bahia Participation Agreement by failing to provide an accounting of all Collections received on the Bahia loan and by withholding its percentage share of those Collections, including specifically the $65,000 from the land sale. LNV also seeks at Count II a declaration that it is entitled by the Bahia Participation Agreement to "share in all payments received – past and future – on the Bahia loan" without offset "as well as [to] an accounting of all Collections resulting from the Bahia loan."

Count II will be dismissed. As with the declarations LNV seeks in relation to the Grande Palisades dispute, the declaration it seeks here regarding its right to a share of the Bahia Collections is subsumed by its breach of contract claim. As for the declaration regarding an accounting, LNV makes only a perfunctory reference to that issue here. In its proposed order, LNV does suggest that the Court order "BF-Negev [to] conduct a full accounting of the Bahia Loan, including all Collections under the Bahia Loan and all distributions of those collections and/or of any proceeds resulting from the Bahia Loan." However, LNV offers no justification for any such declaration or order at this late stage of the litigation. The Collections received on the Bahia Loan are of obvious and central relevance to LNV's breach of contract claim against BF-Negev, and information pertaining to those Collections could have been – and, the Court

assumes, was – sought from BF-Negev in discovery. Any issues that may have arisen relating to BF-Negev's production of that information could and should have been addressed in discovery, which is now closed. *See Cox v. Mortgage Elec. Registration Sys., Inc.*, 685 F.3d 663, 668 (8th Cir. 2012) (affirming dismissal of plaintiffs' request for an accounting where "the information [they] seek is available through discovery if they can plead any valid claim, and the existence of this legal remedy renders an accounting unwarranted"); *Border State Bank, N.A. v. AgCountry Farm Credit Servs., FLCA,* 535 F.3d 779, 784 (8th Cir.2008) (finding that an accounting was not warranted where the plaintiff "had the opportunity to obtain [the] information" during discovery and "[did] not explain why . . . deficiencies [in the defendant's production] could not have been adequately addressed through discovery").

As for Count IV of the Complaint, LNV's breach of contract claim against BF-Negev is governed – as the Bahia Participation Agreement is – by Minnesota law. In Minnesota, "[t]he elements of a breach of contract claim are "(1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant, and (3) breach of the contract by defendant." *Lyon Fin. Servs., Inc. v. Illinois Paper & Copier Co.*, 848 N.W.2d 539, 543 (Minn. 2014) (quotation omitted).

These elements are satisfied here. BF-Negev and OSM acknowledge that LNV is entitled by the Bahia Participation Agreement to the roughly $65,000 from the proceeds of the land sale and concede that they have not disbursed that amount to LNV. They do contend in defense that they withheld that amount as a set-off against the debt they believed LNV owed to OSM under the Grande Palisades Participation Agreement.

However, there was no mutuality between the two debts that were set off. Under Minnesota law, only debts "between the same parties and in the same right" may be set off.

*Firstar Eagan Bank, N.A. v. Marquette Bank Minneapolis*, N.A., 466 N.W.2d 8, 12 (Minn. Ct. App. 1991) (explaining that "setoff is an equitable remedy" that may be available "when . . . the debts are mutual – that is, between the same parties and in the same right") (quoting *Nietzel v. Farmers & Merchants State Bank of Breckenridge*, 238 N.W.2d 437, 440 (Minn. 1976)).  Yet, when the set-off was taken, LNV owed the Grande Palisades Extraordinary Expenses to OSM, and BF-Negev owed the Bahia Collections to LNV.

BF-Negev and OSM argue that it is OSM in its capacity as the servicer of the Bahia loan, rather than BF-Negev in its capacity as the lead lender, that is obligated to pay LNV its share of the Bahia Collections.  This is unpersuasive.  Under the Bahia Participation Agreement, it is undoubtedly the lead lender – BF-Negev – that owes LNV its share of the Bahia Collections; indeed, the Bahia Participation Agreement does not even mention a "servicer."  While all three of the parties agree that OSM administers the Bahia loan and participations on BF-Negev's behalf – BF-Negev and OSM specifically state as fact that "[t]hrough a series of assignments" OSM acquired "the *servicing rights* for the Bahia loan" – BF-Negev and OSM have failed to point to any facts from which it could be found that OSM ever assumed from BF-Negev the obligation to pay LNV its share of the Collections.[4]  The Court therefore concludes that BF-Negev was not entitled to withhold money that is indisputably owed to LNV under the Bahia Participation Agreement as a set-off against an amount allegedly owed by LNV to a separate, albeit related, entity under a separate contract.

---

[4]      The Defendant's argument that the Bahia Collections are owed to LNV by OSM is also belied by the fact that BF-Negev has never moved to be dismissed from this case.  LNV pled its breach of contract claim relating to the Bahia Participation Agreement specifically and exclusively against BF-Negev.  If OSM had truly assumed BF-Negev's obligation to pay LNV its share of the Collections under the Bahia Participation Agreement, rather than just servicing BF-Negev's payment of those monies, BF-Negev would not be a proper defendant here.

Partial summary judgment is therefore granted to LNV on Count IV. BF-Negev has breached the Bahia Participation Agreement by withholding LNV's share of the Collections.


### III.     Subject matter jurisdiction.

Before closing, a word on the Court's subject matter jurisdiction over this action is warranted. Plaintiff LNV is a Nevada corporation with its principle place of business in Texas. As for the Defendants, BF-Negev is a limited liability company whose sole member is OSM-REO LLC, whose sole member is OSM LLC, whose sole member is Larson LLC, whose sole member is Genco LLC, which has two individual members who are both citizens of Texas. Thus, there is no diversity of citizenship. *See* 28 U.S.C. § 1332(c)(1) ("[A] corporation shall be deemed to be a citizen of every State . . . by which it has been incorporated and of the State . . . where it has its principal place of business . . . ."); *Carden v. Arkoma Associates*, 494 U.S. 185, 195-96 (1990) ("We adhere to our oft-repeated rule that diversity jurisdiction in a suit by or against [an] entity depends on the citizenship of 'all the members,' . . . 'the several persons composing such association,' [and] 'each of its members' . . . .") (internal citations omitted).

In the absence of diversity, LNV asserted in its Complaint that the Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, which grants to the district courts "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." As the Supreme Court has explained,

> Article III of the Constitution gives the federal courts power to hear cases "arising under" federal statutes. That grant of power, however, is not self-executing, and it was not until the Judiciary Act of 1875 that Congress gave the federal courts general federal-question jurisdiction. Although the constitutional meaning of "arising under" may extend to all cases in which a federal question is "an ingredient" of the action, . . . we have long construed the statutory grant of federal-question jurisdiction as conferring a more limited power. . . .

*Merrell Dow Pharm. Inc. v. Thompson*, 478 U.S. 804, 807-08 (1986) (citations omitted). As a result, the jurisdiction of the district courts is confined under § 1331 to those cases in which "a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 689-90 (2006) (quoting *Franchise Tax Bd. of Cal. v. Construction Laborers Vacation Trust for Southern Cal.*, 463 U.S. 1, 27–28 (1983)).

"Well-pleaded complaint" is a term of art signifying that a "complaint will not serve as the basis of subject matter jurisdiction insofar as it goes beyond a statement of the plaintiff's cause of action . . . ." *First Fed. Sav. & Loan Ass'n of Harrison, Ark. v. Anderson*, 681 F.2d 528, 532 (8th Cir. 1982). Neither a defendant's counterclaims and defenses, nor a plaintiff's defenses to anticipated counterclaims and responses to anticipated defenses, can establish "arising under" jurisdiction. *Vaden v. Discover Bank*, 556 U.S. 49, 70 (2009); *Holmes Grp., Inc. v. Vornado Air Circulation Sys., Inc.*, 535 U.S. 826, 831-32 (2002); *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 673-74 (1950).

LNV's causes of action with respect to its participations in the Grande Palisades and Bahia loans arise under state, not federal law. But, LNV's well-pleaded complaint demonstrates that "the vindication of [its] right under state law" to recover under the Grande Palisades Participation Agreement "necessarily turn[s] on some construction of federal law," *Franchise Tax Bd.*, 463 U.S. at 9 – namely, the federal common law of contracts and FIRREA. As discussed above, LNV prevails on that portion of the case so long as it is not responsible for making good on the obligations that arose under the Grande Palisades Participation Agreement prior to September 30, 2009. That outcome results from any of three alternative theories: either

38

(1) in the Funding Agreement, the Contributing Participants permanently assumed those obligations from Columbian and/or the FDIC-R; or (2) in the Loan Sale Agreement – a government contract that is "controlled" by federal common law – LNV did not assume those obligations; or (3) any claim arising from those obligations is invalid under FIRREA for the failure to exhaust administrative remedies. The latter two depend on federal law.

While LNV has presented and pursued this line of argumentation in some form or another since the inception of this case, the Court questioned the parties as to whether it was adequately reflected in LNV's Complaint. They believed that it was, but agreed to a small amendment that was designed to close any gap that could be perceived to have developed between the language of the pleading and the manner in which the case has been argued.[5] *Cf.* Fed. R. Civ. P. 15(b)(2) (providing that the pleadings may be amended "at any time . . . to conform them to the evidence and to raise an unpleaded issue").

The Court therefore concludes that LNV's claims relating to its participation in the Grande Palisades loan present substantial federal questions within the meaning of 28 U.S.C. § 1331, and that its claims relating to its Bahia participation fall within the supplemental jurisdiction provisions of 28 U.S.C. § 1367.

## Conclusion

As is explained above, the Court concludes that it possess subject matter jurisdiction over this action and that OSM has standing to pursue its counterclaims against LNV.

The non-contract claims that remain in this case – Counts I, II, and III of LNV's Complaint, and Counts Two and Three of OSM's Counterclaims – are dismissed. As for the

---

[5] LNV subsequently expressed confusion about that agreement, but it stands.

breach of contract claims, partial summary judgment on liability is granted to LNV on Counts IV and VIII of its Complaint, and Count One of OSM's Counterclaims is dismissed.

It is established that LNV has a 2.12424110% participation interest in the Grande Palisades loan. OSM has breached the Grande Palisades Participation Agreement by withholding from LNV its 2.12424110% share of the Collections received on the loan, less LNV's 2.12424110% share of the Extraordinary Expenses that have come due since September 30, 2009. In addition, it is established that LNV has a 3.33333333% participation interest in the Bahia loan. Defendant BF-Negev has breached the Bahia Participation Agreement by withholding from LNV its 3.33333333% share of the Collections received on that loan.

With liability thus resolved, the parties are directed to meet and confer regarding the amounts LNV will recover from OSM and BF-Negev in light of the rulings contained in this order. They shall then inform the Court in a joint letter, filed electronically within three weeks of the date of this order, as to whether a trial on damages will be necessary.

Based on the files, records, and proceedings herein, and for the reasons discussed above, IT IS ORDERED THAT:

1. Plaintiff LNV Corporation's Motion for Summary Judgment [ECF No. 116] is
   GRANTED IN PART and DENIED IN PART consistent with the memorandum above.

2. Plaintiff LNV Corporation's Second Motion for Summary Judgment [ECF No. 127] is
   GRANTED IN PART and DENIED IN PART consistent with the memorandum above.

3. Counts I, II, and III of Plaintiff LNV Corporation's Complaint and Counts One, Two, and Three of Defendant Outsource Service Management, LLC's Counterclaims are DISMISSED consistent with the memorandum above.

4. Partial summary judgment on liability is GRANTED to Plaintiff LNV Corporation on Counts IV and VIII of its Complaint consistent with the memorandum above.

5. The parties shall meet and confer regarding the amounts LNV will recover from OSM and BF-Negev in light of the rulings contained in this order. They shall then inform the Court in a joint letter, filed electronically within three weeks of the date of this order, as to whether a trial on damages will be necessary.


Dated: August 17, 2015                    s/Joan N. Ericksen_____
                                          JOAN N. ERICKSEN
                                          United States District Judge